# Richmond.

## Eugene S. Hobbs v. Virginia National Bank of Petersburg, Virginia.

May 28, 1925.

Reheard May 27, 1926.

1. PARTNERSHIP—*Estoppel—Holding out as Partner—Case at Bar.*—In the instant case, the question at issue was whether defendant was a partner with one T. in a mercantile firm. Defendant entered into an agreement with T. under which T. was to conduct the business in respect to third persons, just as if it were an actual partnership, though from other stipulations it appeared that there was no actual partnership. The agreement was for the purpose of obtaining credit for T. T. repeatedly held out defendant as his partner in the business. Mercantile agencies listed T. and defendant as partners in the business. Statements made by T. of the assets and liabilities of the firm to a bank stated the names of the partners as defendant and T. And at least one of such statements to the bank was signed by defendant.

   *Held:* That there was evidence sufficient to support a verdict holding defendant liable for the debts of the concern as a partner by estoppel.

2. PARTNERSHIP—*Actual Partnership—Community of Interest.*—A person may be an actual or a true partner of another because they are engaged in a joint enterprise in which they have a community of interest and share in the profits.

3. PARTNERSHIP—*Estoppel—Ostensible Partner.*—A partner by estoppel is ordinarily designated as a nominal or ostensible partner; and is one who, although not an actual partner, has made himself liable upon the ground that he is estopped from denying that he is a partner by holding himself out as such or allowing himself to be so held out.

4. PARTNERSHIP—*Estoppel—Ostensible Partner—Liability.*—Persons who are not actually partners may nevertheless become subject to the liabilities of partners, either by holding themselves out as such to the public and the world generally, or to particular individuals; or by knowingly or negligently permitting another person to do so. Yet in fact such a person does not become a partner; he is merely liable as a partner; for individuals may be liable as partners as to third persons, while as between themselves they are not to be considered partners.

5. PARTNERSHIP—*Estoppel—Ostensible Partner—Liability.*—Persons may therefore be made liable as partners, as far as third persons are concerned, by assertions, admissions, and acts tending to show that they are such, although such evidence might be insufficient to prove a partnership as between the parties themselves.

6. PARTNERSHIP—*Estoppel—Ostensible Partner—Liability—Intention.*—The question of liability does not depend on the intention of the parties, for persons who are not partners may by estoppel be held to the responsibilities of partners directly contrary to their own intentions.

7. PARTNERSHIP—*Holding Out—Extent of Liability—"Credit"—"Trade"—Bank Loan—Case at Bar.*—In the instant case defendant had entered into an agreement with one T. under which 'for the accommodation of T. and for "the purpose of giving him credit in and about the said trade," a copartnership was ostensibly formed though in reality there was no community of interest. In an action against defendant on a note of the partnership to a bank, it was argued that the credit so referred to meant credit on the purchase of goods or stock in trade, and did not include money borrowed at banks.

   *Held:* That the language was not capable of such a restricted construction. Credit at banks is one of the most important items of credit.

8. WORDS AND PHRASES—*Credit in and about Trade—Partnership—Right to Borrow Money.*—Certainly credit "in and about the trade" would include all credit reasonably incidental to the business, and it is well settled that mercantile partnerships have the right to borrow money and may be expected to do it.

9. PARTNERSHIP—*Ostensible Partner—Uniform Partnership Act.*—The circumstances under which a person should be held bound as a partner by estoppel are stated in section 16 of the uniform partnership act. Acts 1918, page 545. The statutory rule is substantially an expression of the common law as recognized by the courts, and certainly puts a person claimed to be an ostensible partner in no more advantageous position.

10. PARTNERSHIP—*Existence of Partnership—General Reputation.*—It is settled that the common report, or general reputation, is not admissible upon an issue of general partnership, and cannot be used to prove an actual partnership. It seems, however, to be also well settled that when it is sought to hold a person as a partner by estoppel, general reputation is admissible if known to him, or brought about with his consent, or by his acts.

11. PARTNERSHIP—*Existence of Partnership—General Reputation—Case at Bar.*—General reputation of a man's being a partner of another is not of itself admissible to hold one liable as a partner; it must be supported by evidence showing knowledge of the existence of the reputation and a failure to deny it under such circumstances as to create the estoppel. Likewise the holding out of a person by some

one other than himself without his knowledge is not sufficient to bind him to a partnership liability. But in the instant case the reputation was naturally and necessarily brought about by defendant's own conduct, and was the consequence of his own act in making an agreement with one T. that he might hold him out as his partner. The law holds a person to intend, have knowledge of, and to be responsible for the natural consequences of his own act or undertaking.

12. PARTNERSHIP—*Ostensible Partner—Evidence—Written Statements to a Bank—Case at Bar.*—In the instant case the question at issue was whether defendant was a partner of one T. in a mercantile business. Defendant excepted to the admission of a written statement of liabilities and assets made to a bank signed by T. and himself, and to preceding similar statement signed by T. only on the ground that plaintiff knew nothing of the dealings between T. and the bank, and also that the statement signed by defendant was made subsequent to the time T. borrowed the money in suit from the plaintiff.

    *Held:* That these statements were admissible.

13. PARTNERSHIP—*Partnership by Estoppel—Instruction—Harmless Error.*— Where the question at issue was the liability of defendant as ostensible partner in a mercantile firm, although an instruction given by the court was not clear in its purport and effect, yet, considering the overwhelming tendency of the evidence to establish a partnership by estoppel, the clear statement of the law in another instruction, and the statement of the law as a whole resulting from considering the two instructions together, there was no possibility of the jury having been misled, and if there was error, it was harmless error.

14. BANKS AND BANKING—*Loans—Partnership.*—Where money is borrowed in the name of and for the use of an apparent partnership, there is no duty upon the bank to inquire whether it was to be devoted to partnership purposes exclusively.

## ON REHEARING.

15. PARTNERSHIP—*Holding Out as Partner—Evidence—Statement of Condition of Firm—Knowledge of the Defendant.*—In the instant case, an action to hold defendant liable to plaintiff bank upon an endorsement of a note by a partnership on the ground that he had permitted himself to be held out as a member of the partnership, a statement of the condition of the partnership rendered to another bank and signed by the defendant and one T. as the two persons composing the partnership was offered in evidence. It was objected that this statement was not admissible as its existence was unknown to and did not influence the plaintiff bank in making the loan. Defendant denied that the so-called partnership agreement authorized T., the other partner,

to represent to anyone that defendant was a partner in the firm, and contended in his testimony that he understood the arrangement between T. and himself to have the effect only of allowing the firm to buy trade goods upon his credit.

*Held:* That the statement was made admissible by this testimony of defendant and the introduction of the so-called partnership agreement in writing between him and T.

16. PARTNERSHIP—*Ostensible Partner—Holding Out—Case at Bar.*—In the instant case defendant and one T. entered into an agreement to form a copartnership, in which it was stated that the copartnership was formed for the sole accommodation of T., "for the purpose of giving him credit in and about the said trade." Later the partnership rendered a financial statement to a bank signed by the partnership and by T. and the defendant.

*Held:* That reading these two papers together the parties intended that they should be taken by the business world as partners and that defendant's property should be considered as financial backing for the firm.

17. PARTNERSHIP—*Ostensible Partner—Liability on Firm's Endorsement—Case at Bar.*—In the instant case, where an agreement between defendant and one T. had authorized T. to hold out defendant to the world as a partner with T. in a firm for the purpose of giving T. credit in and about the trade therein mentioned, if T. represented to plaintiff bank that defendant was his partner in the business and the plaintiff in good faith loaned the partnership the money represented by the note sued on, upon the faith of this representation, then defendant became liable as a partner upon the note.

18. ESTOPPEL—*Probative Effect of Writing—Parol Evidence.*—It is a fundamental principle of law that a person cannot deny the effect of a writing intentionally and purposely signed by him in order to accomplish a definite object. The probative effect of the writing overweighs all parol testimony as to intention.

19. PARTNERSHIP—*Estoppel—Holding Out.*—In the application of the doctrine of estoppel to the case of one sought to be held liable as a partner by holding out, there is a distinction between the cases where the holding out is shown to be by the consent or authority of the defendant, and the cases in which the liability is rested upon a statement shown to have been untrue and which the defendant had failed to deny.

20. PARTNERSHIP—*Estoppel—Holding Out—Estoppel by Contract—Case at Bar.*—In the instant case, defendant entered into a so-called partnership agreement with one T. in order to give T. credit in and about the trade in which the partnership was dealing.

*Held:* That this created an estoppel in the nature of an estoppel by contract; that defendant upon the evidence was estopped to deny all

just and reasonable consequences which resulted from the agreement between himself and T.; and that if T. represented to the plaintiff that defendant was his partner he had a right to do so and was authorized by defendant to do so.

21. PARTNERSHIP—*Ostensible Partner—Holding Out—Agreement to Give Credit to the Other Member of the Partnership—Case at Bar.*—In the instant case defendant entered into a so-called partnership agreement in writing with one T. for the purpose of giving T. credit with trade.

*Held:* That the fact that defendant consented to his being represented by T. as a partner with him in the firm is within the scope of the written agreement between the parties, and in fact was the very purpose of that agreement.

22. PARTNERSHIP—*Holding Out as Partner—Requisites to Creation of Liability as Ostensible Partner.*—No person can be fixed with liability on the ground that he has been held out as a partner, unless two things concur, viz, first the alleged act of holding out must have been done either by him or by his consent, and secondly, it must have been known to the party seeking to avail himself of it.

23. PARTNERSHIP—*Holding Out as Partner—Requisites to Creation of Liability as Ostensible Partner—Knowledge of Plaintiff—Case at Bar.*—In the instant case, the proof of the authority of one T. to represent defendant as his partner and thereby obtain credit for the firm rested upon a contract in writing. The construction of the contract was a judicial function and the court properly left to the jury to find out whether T. acting under this authority communicated the fact of the partnership to the plaintiff and whether the plaintiff loaned the money on the faith of the existence of the partnership.

24. ESTOPPEL—*Requisites—Prior Knowledge of Authority.*—All the authorities hold that where prior consent, knowledge or authority is shown and the other requisites concur, then the estoppel is established.

25. PARTNERSHIP—*Holding Out as Partner—No Actual Partnership—Estoppel to Deny Actual Partnership.*—When the estoppel prevails in favor of a creditor holding a person to a partnership liability, it is upon the assumption that there was no actual partnership, but by reason of the proof the party held liable is *estopped from denying that there was an actual partnership.* The party against whom the estoppel works becomes in the eye of the law, as to the creditor, an actual partner and will not be heard to deny it.

26. PARTNERSHIP—*Authority of Partner to Bind all Partners—Borrowing Money and Making Notes—Good Faith with Copartner.*—Each member of a partnership has authority to bind all partners by his acts in relation to the business of the partnership, including the borrowing of money and the making and delivering of the notes of the partnership therefor; and, as between the firm and third persons dealing

with them in good faith, it is of no consequence whether the partner is acting in good faith with his copartners or not, provided the act is done within the scope of the partnership business and professedly for the firm.

27. PARTNERSHIP—*Liability of Ostensible Partner—Good Faith of Bank Making the Loan—Case at Bar.*—In the instant case defendant entered into a so-called partnership agreement for the purpose of securing for T. credit in and about the trade in which the firm was engaged. T. secured a large loan from a bank for the firm and it was argued that the statement of the condition of the business showed that the loan was out of proportion to the amount of the business done by the firm, and, therefore, the bank should have taken cognizance of this condition. From the undisputed testimony of the president of the bank it appeared that the bank loaned the money in the regular course of business, in perfectly good faith, to a firm of known financial ability, and for a purpose regularly within the scope of a trading partnership, *i. e.*, to discharge indebtedness it owed.

*Held:* That there was nothing in the record to impugn the good faith of the bank or put them on their guard.

28. PARTNERSHIP—*Commercial Partnership—Money Borrowed by a Member on the Credit of the Firm—Liability of Partnership.*—In general, a commercial partnership will be liable for money borrowed by one of its members on the credit of the firm, for commercial partnerships are engaged in buying and selling, and within the scope of buying and selling, it is an incident of the business to borrow money, therefore, the power to borrow money for the firm and the authority to bind the firm by the loan is implied in each partner. Moreover the lender, in order to charge all of the several partners, is not required to see that the money thus borrowed is applied to partnership purposes. All that is necessary is that he act in good faith and without knowledge, actual or constructive, that the borrower intends to use the money to further his own individual interests. But if the lender, at the time of making the loan, knows or has reason to believe that the partner is seeking to obtain money for his individual benefit, or that the transaction is out of the ordinary course of business, then the firm is not liable. What is "out of the ordinary course of business" depends on the circumstances of each case.

29. PARTNERSHIP—*Money Borrowed in Partnership Name—Presumption.*— The presumption is that money borrowed in the partnership name was borrowed for partnership purposes and in the course of the business conducted by the partnership.

30. PARTNERSHIP—*Money Borrowed in Partnership Name—Rebuttal of Presumption that Money was Borrowed for Partnership Purposes—Burden of Proof.*—If by reason of the unusually large sums borrowed from a bank by a partner for business purposes, and the knowledge the

bank officials had of the business and of the partners and other circumstances, the defense is made that notice should be imputed to the bank that the loans were not intended for the partnership business, and that the bank should have made inquiry and that such inquiry would have developed that the money borrowed was not to be used in fact for partnership purposes—then the establishment of such defense is upon the defendant partner.

31. PARTNERSHIP—*Money Borrowed by a Partner in Partnership Name— Whether Partner was Borrowing Money for His Personal Benefit and not for the Firm's Business is a Question for the Jury—Case at Bar.*—In the instant case the question, whether in borrowing from the plaintiff bank T., a member of a partnership, borrowed the money for his personal benefit or otherwise, not for the reasonable requirements of the firm's business, and without the knowledge of and in fraud of his partner, the defendant, was for the jury.

32. PARTNERSHIP—*Money Borrowed by a Partner in Partnership's Name— When Creditor Put Upon Inquiry as to Partner's Authority—Case at Bar.*—In the instant case, an action against defendant, as a partner in a firm, whether under all the circumstances in evidence, and with the knowledge shown to be possessed by the plaintiff bank and by defendant respectively, notice should be imputed to the bank that the transactions of defendant's partner T. in making the loans were suspicious and should have put the bank upon inquiry, and inquiry would have disclosed that T. was exceeding his implied power as a partner without the assent of defendant, was for the jury.

33. APPEAL AND ERROR—*Remand—Remand for Trial of One or More Issues.*— In the instant case the instructions of the court below practically withdrew from the jury two questions which should have been submitted to them, therefore, the Supreme Court of Appeals reversed the case and remanded it for a new trial upon these two issues, all other questions in the case to be taken as settled in accordance with the views expressed by the Supreme Court of Appeals.

Error to a judgment of the Hustings Court of the city of Petersburg, in a proceeding by motion for a judgment for money.    Judgment for plaintiff.    Defendant assigns error.

*Reversed and remanded.*

The opinion states the case.

*Mann & Townsend* and *Richard D. Gilliam,* for the plaintiff in error.

*Richard H. Mann*, for the defendant in error.

CRUMP, P., delivered the opinion of the court.

This case is before the court on a writ of error awarded to a judgment upon a verdict for the plaintiff in an action, instituted by a notice of motion, in which the defendant in error, the Virginia National Bank, was plaintiff, and the plaintiff in error was one of the defendants, being sued as "Eugene S. Hobbs, surviving partner of J. W. Thomas, deceased, and himself, the said Eugene S. Hobbs, partners, trading as J. W. Thomas & Company." The claim was upon several negotiable notes made and endorsed by "J. W. Thomas & Company." The defendant, Hobbs, filed an affidavit denying that he was a surviving partner of the firm of J. W. Thomas & Company, or that he had ever at any time been a partner of J. W. Thomas.

Upon the trial, the execution of the notes by J. W. Thomas & Company was not denied, and the sole issue to be determined was whether or not the plaintiff in error, Hobbs, was liable upon the notes as a partner of J. W. Thomas. After considerable testimony had been adduced by both plaintiff and defendant, and the court had given instructions, the jury found a verdict for the plaintiff in the sum of $18,970.12, upon which judgment was rendered.

For convenience the parties will be designated in this opinion according to the positions they occupied respectively before the trial court.

It is assigned as error here that the verdict was contrary to the law and the evidence, and we will consider this assignment first.

The following facts were established by the evidence without dispute:

Prior to the year 1900, J. W. Thomas was conducting in Petersburg, as manager for the owner of the business, an establishment dealing in china, crockery ware, and kindred articles. In the year just mentioned, Thomas bought the entire business as it stood from the owner. He appears to have been without means, and therefore without trade credit. He raised the money to pay the owner for the business upon his notes endorsed by two persons, who were relieved by him of their endorsement in the following two years. The defendant, Hobbs, was a brother-in-law of Thomas, who had married his sister. Hobbs resided on the Norfolk and Western Railroad about thirty miles from Petersburg, and was a man of comparative wealth and of good credit standing in financial circles in Petersburg, being at that time or afterwards director in two financial institutions in the city and being well known to business and financial men there.

The defendant being desirous to put Thomas in a position to conduct the business with success, agreed that he might be regarded as a partner, and to that end they entered into the following agreement, which was signed by both of them in person:

"Articles of agreement, made and entered into this first day of February, 1900, between E. S. Hobbs, of the one part, and J. W. Thomas, of the other part;

"Whereas, the said E. S. Hobbs and J. W. Thomas have agreed, and by these presents do agree, to become copartners together in the trade of china, crockery ware, willow ware, and kindred articles, and all things thereto belonging, and also in buying, selling, and retailing all sorts of wares, goods and commodities belonging to said trade, which said copartnership is to continue from the date hereof, for and during the pleasure of the said parties, to be terminated at any time by either of them; and

"Whereas, the said copartnership is formed for the sole accommodation of the said J. W. Thomas for the purpose of giving him credit in and about the said trade; and

"Whereas, the said E. S. Hobbs is to have no interest in any of the property or profits of the said copartnership, and is to put in no money, goods or stock of any kind into the said copartnership;

"Now, therefore, this agreement witnesseth: That for and in consideration of the premises, the said J. W. Thomas doth covenant and agree to and with the said E. S. Hobbs, that he, the said J. W. Thomas, will pay all of the debts contracted and to be contracted by the said copartnership in and about the said business, and also that all such losses as shall happen in the said joint trade by bad debts, ill commodities or otherwise, and all wages, charges, expenses, rents, purchases and payments whatsoever, relative to and in the said joint trade, shall be paid and borne by the said J. W. Thomas; it being understood and agreed that all such gain, profit and increase that shall come, go, or arise for or by reason of the said joint trade, shall be, during the said copartnership, wholly and solely the property of the said J. W. Thomas. And the said J. W. Thomas doth further covenant to and with the said E. S. Hobbs that all of his, the said J. W. Thomas's estate, real, personal, and mixed, shall be applied to the payment of any and all debts due or to become due during the said term by the said copartnership, and that he will indemnify and save harmless the said E. S. Hobbs from all liability of any kind whatsoever, which at any time may grow out of the said copartnership; and that he will repay any and all sums which the said E. S. Hobbs may be called upon to pay by reason of the said copartnership. And the said J. W. Thomas doth hereby waive the benefit of

his homestead, and all other exemptions as to this obligation.

"Witness the following signatures and seals:

"E. S. HOBBS (Seal)

"J. W. THOMAS (Seal)."

The original of this agreement was found among Thomas's papers after his death, and being in possession of Hobbs as his administrator was put into evidence by him. Thomas conducted the business up to the time of his death, which occurred in October, 1923, when he died by his own hand; and upon examination the business was found to be in a very insolvent condition, as Thomas, under the style of J. W. Thomas & Company, had incurred very large liabilities, in comparison with which the assets appear to have been almost negligible.

On the part of the plaintiff, testimony was introduced tending to show that Thomas had reported to numerous persons in the course of his business transactions—bankers, merchants, wholesale dealers, and others—that Hobbs was a partner in the business with him; and that for many years preceding his death it was commonly considered in business circles in Petersburg that J. W. Thomas & Company consisted of two partners, Thomas and the defendant, Hobbs.

The plaintiff introduced as witnesses agents for Bradstreet and for Dun, the well known mercantile agencies, one of these companies commencing to take reports from Thomas soon after he started in business; and from information received from Thomas and others, both mercantile agencies, in their reports, carried this business as conducted under the style of J. W. Thomas & Company, the partners being Thomas and Hobbs.

An agent for the Bradstreet Company had for a period of approximately fifteen years gone to the office of J. W. Thomas & Company from time to time and

talked to both Hobbs and Thomas concerning the business; that frequently he would go into the store to get information about other people; and that at different periods of the year when their report was to be revised he would ask them about their own affairs.   He further states as follows: "I could not say positively that I asked Mr. Hobbs directly and that he answered the question whether or not he was a partner, because no question ever arose in my mind but that he was.   I started to say that from time to time during the course of the years, certainly once a year or twice a year, we sent out statement blanks and during that time I have personally seen a statement over Mr. Thomas' signature—business $12,000.00; then outside of the business, Mr. E. S. Hobbs, partner, is worth $130,000.00, or something like that, and he (meaning Thomas) would sign at the bottom."   He further stated that it was a generally accepted fact in the business community of Petersburg that they were partners.   The reporter for Dun & Company testified that he had reported that territory for about sixteen years during the period of the alleged partnership; that he knew of the firm of J. W. Thomas & Company and it was an accepted fact in Petersburg that Thomas and Hobbs were partners composing it. There was further testimony tending to show various statements made by Thomas that Hobbs was his partner in business by quite a large number of witnesses, being business men who are interested in such matters. It was further testified by witnesses for the plaintiff that commencing between 1912 and 1915 J. W. Thomas & Company carried an account in the National Bank of Petersburg (not the plaintiff bank) and obtained large credits with that bank by discounting notes signed by him as J. W. Thomas & Company.   While dealing with that bank he rendered from time to time statements re-

quired by the bank as to the condition of the business of J. W. Thomas & Company, and in these statements in stating the names of parties composing the apparent firm he gave them as himself and E. S. Hobbs. All of these statements were signed for J. W. Thomas & Company by Thomas only, except one made in 1922. At the end of the statement, on the form required by the bank, is appended a place for information concerning a partnership and this was filled out in 1922 as follows:

"Do you pledge, sell or otherwise dispose of any of your accounts receivable? No.

"If so, to what extent are any of the accounts in above statement so disposed of? None.

"General partners, J. W. Thomas and E. S. Hobbs.

"Date and expiration of partnership. Indefinite.

"When was business established? 1900.

"Sales for year ending. 15,000

"Average terms of sale. Thirty days.

"Amount of rent paid per annum. $112.50

"Amounts charged off for depreciation and bad debts. I have none I consider bad; been very cautious who I sold this year.

"Amount of insurance? On stock $4,000.00.

"Are accounts insured, and if so, in what company? None.

"Date signed. January 1, 1922.

"Please sign firm name. J. W. Thomas & Co.

"J. W. Thomas and E. S. Hobbs."

It was admitted that E. S. Hobbs signed this statement in person. The National Bank of Petersburg gave accommodation to J. W. Thomas & Company on the faith of Hobbs' financial rating and standing. It was further testified for the plaintiff that in the year 1919, Thomas opened an account for J. W. Thomas & Company at the plaintiff bank, stating that Hobbs was his

partner and, acting upon his statements, upon the reports of the mercantile agencies, and upon what the plaintiff claims to be the universally known and recognized fact that Hobbs was a partner with Thomas, the paper of J. W. Thomas & Company was discounted by the plaintiff bank; that the bank had no knowledge of the purpose of J. W. Thomas & Company for borrowing money from it, except the statements made by Thomas that it was to be used in taking up paper that the firm owed at the National Bank of Petersburg. By renewals and additional discounts the amount for which the plaintiff had paper of J. W. Thomas & Company at the time of Thomas' death was the sum involved in this litigation.

On the part of the defendant there was testimony to the effect that Thomas, in applying for a license to the commissioner of revenue in Petersburg, made application in his individual name as owner of the business of J. W. Thomas & Company, and received licenses in that form. Also that Thomas, in making annual reports to the collector of internal revenue for the assessment of Federal income tax of J. W. Thomas & Company, stated on the forms required that he was the owner of the business, or that J. W. Thomas was trading as J. W. Thomas & Company, and that from the return the collector regarded Thomas as the individual owner of the business, as a partnership was required to file a partnership return. Mr. Hobbs testified himself at some length. He stated that he never had any interest in the business; that he had put no capital in it and had never received anything from it; that he had never held himself out as a partner to the Virginia National Bank as being in any way connected with the business; that he did not keep up with the condition of the business and knew nothing about it until Thomas' death, nor did he know until after

that time that Thomas owed the plaintiff anything; that no one connected with the plaintiff bank had intimated to him in any way until after Thomas' death that he was responsible for money borrowed from the bank; nor did he know before Thomas' death that the bank regarded him as a partner of Thomas; that in meetings of the directors of other institutions, he was thrown with the officers of the plaintiff bank and no one of them ever intimated to him that Thomas had told the bank that he (Hobbs) was a partner in Thomas' business. Mr. Hobbs further testified that he had not seen the agreement signed by him, since about the time of its date, until after Thomas' death; that he did not know it was in existence and Thomas had never spoken to him about it; and he says "that contract was made, as I understand, for me to give him backing in the trade, in the mercantile trade, I do not mean mercantile trade, I mean the trade in the business," and that it was just to start him in business. He further testified that he had forgotten about the existence of the agreement. In connection with the statement to the National Bank of Petersburg, signed by Thomas and himself, in 1922, he testified that he did not remember where or when he signed the statement, whether he signed it as the liabilities were placed at $500.00, for which he was willing to be liable, but he would not have signed it if Thomas had stated the liabilities at a greater sum than $500.00. He was asked: "Did you ever intentionally do anything calculated to make any one think you were a partner of J. W. Thomas or responsible for his debts?" To which he answered: "I did not." Mr. Hobbs denied, in refutation of statements made by several witnesses of the plaintiff, that he had ever said anything to them either before or after the death of Thomas which would lead them to believe that he was a partner with Thomas or interested in the business.

[1-3] The testimony for the plaintiff was quite volu-
minous, but the foregoing summary of the evidence on
both sides brings out sufficiently the relevant matters
before the jury. As is usual in cases in which issue is
joined upon a plea by one of the defendants that he was
not a partner of the other defendant, the plaintiff appar-
ently endeavored, by the wide scope of the evidence in-
troduced by it, to show either an actual or a nominal
partnership. They had a right to rely upon either to
establish the case. The effort to prove an actual part-
nership manifestly failed, and while not altogether aban-
doned before this court, the argument for the defendant
in error is based almost entirely upon the contention
that an ostensible or nominal partnership is so plainly
made out that the verdict of the jury is necessarily right.
Therefore, we need not consider the question whether or
not the evidence was sufficient in any event to find that
Hobbs was or was not actually a partner with Thomas
in the firm of J. W. Thomas & Company. The real is-
sue between the parties arising upon the evidence was
whether or not Hobbs made himself liable for the debts
of the concern as a partner by estoppel, and we are of
opinion that the evidence was certainly amply sufficient
to justify the court in submitting that issue to the jury,
and to sustain the verdict of the jury. A person may be
an actual or a true partner of another because they are
engaged in a joint enterprise in which they have a com-
munity of interest and share in the profits. A partner
by estoppel is ordinarily designated as a nominal or
ostensible partner; and is one who, although not an
actual partner, has made himself liable upon the ground
that he is estopped from denying that he is a partner,
by holding himself out as such or allowing himself to be
so held out.

[4-6] The general doctrine as to a nominal or osten-

sible partner is very well stated in 20 R. C. L., page 1067, as follows: "Persons who are not actually partners may nevertheless become subject to the liabilities of partners, either by holding themselves out as such to the public and the world generally, or to particular individuals; or by knowingly or negligently permitting another person to do so.   Yet in fact such a person does not become a partner; he is merely liable as a partner; for individuals may be liable as partners as to third persons, while as between themselves they are not to be considered partners.   This question of the effect of holding out as a partner arises only in dealing with third persons and cannot be raised between the parties themselves, for every one is presumed to know who are his associates in business.   Persons may, therefore, be made liable as partners, as far as third persons are concerned, by assertions, admissions, and acts tending to show that they are such, although such evidence might be insufficient to prove a partnership as between the parties themselves.   Under no other circumstances except where there has been a holding out as a partner does the law make one liable as a partner who is not actually a partner.   The liability of a person who holds himself out as a partner, or permits others to do so, is predicated on the doctrine of estoppel, and on the policy of the law seeking to prevent frauds on those who lend their money on the apparent credit of those who are held out as partners.   The question of liability does not depend on the intention of the parties, for persons who are not partners may, by estoppel, be held to the responsibilities of partners directly contrary to their own intentions." This subject is also treated in 1 Lindley on Partnership (Ewell's Ed.), pages 47-55, and 5 Elliott on Contracts, section 4938.   And see, also, *Wesi* v. *Driscoll,* 142 Md. 205, 120 Atl. 445; *Sun Ins. Co.* v. *Kountz,* 122 U. S. 583,

7 S. Ct. 1278, 30 L. Ed. 1137; *Johnson* v. *Williams*, 111 Va. 95, 68 S. E. 410, 31 L. R. A. (N. S.) 406, Ann. Cas. 1912-a, 47.

Mr. Hobbs in his evidence does not give any details as to the circumstances under which the agreement between himself and Thomas was entered into, and does not state by whom it was drawn. This agreement is a very unusual paper and must have been the subject beforehand of careful consideration. It was drawn up by some one acquainted with legal forms, and is phrased in technically apt language. It is a formal document under seal. The first clause was sufficient to constitute the parties actual partners. The subsequent stipulations between the parties show that legally Hobbs did not become an actual partner of Thomas. Nevertheless, in all of those stipulations, the effect of the first clause is referred to as the "said joint trade" and the "said copartnership," thus emphasizing the fact that the parties were to be taken and regarded in all respects as partners. Mr. Hobbs must have been aware of the fact that an actual partnership is a coalescence of business personalities; indeed, the law likens it to the closeness of the tie formed by marriage. It is difficult to conceive of a more formal and absolute blanket authority to Thomas to conduct the business in respect to third persons just as if there was an actual copartnership formed, consisting of himself and Hobbs. It is difficult to conceive how any one can read this agreement and reach any other conclusion. It was perfectly natural, therefore, that with this agreement at all times in his possession, Thomas should consider himself in the position to say to all persons with whom he had dealings, or from whom he sought credit, that Hobbs was his partner unless and until Hobbs had forbidden him so to do, and so terminate the agreement as he had, in ac-

cordance with its terms, a right to do.   It is rather diffi-
cult to understand how Mr. Hobbs could have forgotten
the existence of such an arrangement, or how he could
have testified as he did that he never in any way
authorized Thomas to represent him as his partner.   It
was not inconsistent that Thomas, when required to
make statements for licenses and in respect to the in-
come tax, should state that he was the *owner* of the busi-
ness, for as between Hobbs and himself such was the
fact and the agreement required him to pay all such ex-
penses, although Hobbs had authorized him when seek-
ing *credit* for the business to put upon him, Hobbs, the
liability of a partner.

[7, 8] It was argued by learned counsel for the de-
fendant that inasmuch as the agreement stated that the
copartnership was formed "for the sole accommodation
of the said J. W. Thomas for the purpose of giving him
credit in and about the said trade," it followed that the
credit so referred to meant credit on the purchase of
goods or stock in trade, and did not include money bor-
rowed at banks.   We do not think the language is capa-
ble of such a restricted construction.   In these days it
may be said, as to the great mass of business, that credit
at the banks is one of the most important items of
credit.   It is commonly known that wholesalers sell to
the retailers for a stated price, less a certain discount or
percentage if paid within ten days or within some other
period from the time of delivery, and that the retail mer-
chants are in the habit of borrowing from banks in order
to take advantage of purchases on such terms.   Cer-
tainly credit "in and about the trade" would include all
credit reasonably incidental to the business, and it is
well settled that mercantile partnerships have the right
to borrow money and may be expected to do it.   See
*Commercial Bank* v. *Miller*, 96 Va. 365, 31 S. E. 812.

The inference from the testimony seems irresistible that the partnership agreement was necessarily a creative and continuing influence, under which Thomas acted in spreading the information that Hobbs was his partner and in signing statements to that effect.   It was, also, in an equal degree necessarily, the sole existing source which impelled Hobbs to state in writing to the National Bank that he was a partner in the firm of J. W. Thomas & Company; no other suggestions or explanations appear in the testimony in any way reasonably in accord with the other facts in the case.   It is difficult to conceive how Mr. Hobbs could so shackle his memory as to forget the existence of this formal document.

Upon a review of the evidence it was indeed scarcely possible for the jury to find any other verdict than one holding Mr. Hobbs liable as a partner by estoppel.   In the ordinary case there is a mere holding out by the known party or some third party or outside agency, and the effort of the plaintiff is to bring home to the defendant sought to be held, knowledge of the holding out and a failure on his part to take steps to repudiate it.   Here, however, the holding out to the trade and to persons giving credit to J. W. Thomas & Company, apparently a firm consisting of more than one person, was expressly authorized in 1900, and holding out under such authority further acquiesced in by writing in 1922, so that the holding out was done from the inception with his authority and consent.   It was fairly established that the creditor gave credit upon the faith of a holding out or statement directly traceable not merely to the conduct, or silence or negligence of Mr. Hobbs, but to his affirmative act and consent.

We see no error in the action of the court in overruling the motion to set aside the verdict.

[9] We have so far made no reference to the uniform

partnership act, adopted in Virginia in 1918. If the provisions of that act are applicable to the transactions here following upon the agreement between Thomas and Hobbs, executed in 1900, the conclusions to be derived from the evidence will suffer no change. The circumstances under which a person should be held bound as a partner by estoppel are stated in section 16 of the act. Acts 1918, page 545. The statutory rule is substantially an expression of the common law as recognized by the courts, and certainly puts a person claimed to be ostensible partner in no more advantageous position.

The testimony as to the common reputation in Petersburg of the existence of the copartnership and the testimony as to statements made by Thomas that Hobbs was his partner, were objected to by the defendant, on the ground that knowledge of these matters was not brought home to him; and, therefore, the defendant could not be estopped to deny the partnership because he did not know of the reputation and these statements.

[10] It is settled that the common report, or general reputation, is not admissible upon an issue of general partnership, and cannot be used to prove an actual partnership. It seems, however, to be also well settled that when it is sought to hold a person as a partner by estoppel, general reputation is admissible if known to him, or brought about with his consent, or by his acts. 3 Wigmore on Evidence, section 1624; L. R. A. 1918D, pages 510-513. In the case of *Anfenson* v. *Banks*, 180 Iowa, 1066, 163 N. W. 608, to which the citation just made is an annotation, depositors in a bank sought to hold the defendant as an ostensible partner in a banking concern because the bank had issued a circular in which it was stated that the defendant was interested in the bank, and upon which circular the depositors had relied. It appeared that the defendant was not an actual part-

ner, and that the circular was issued without his authority, and that he had no knowledge of it. Under these circumstances, the court held the defendant not liable, in an opinion of some length. It is there stated: "No man is to be held responsible for the truth or falsity of a current report or reputation concerning himself, or his business, unless he has given rise thereto by his own conduct, or the existence thereof has been brought to his knowledge in such manner that in equity and good conscience he should meet it with a denial." See also *Cook* v. *Coleman,* 90 W. Va. 748, 111 S. E. 750; *Barnett Bank* v. *Chiatovick* (Nev.), 232 Pac. 206; *Irvine* v. *Baxter Stove Co.,* 70 Ind. App. 105, 123 N. E. 185; *Bedell* v. *Morris,* 63 Cal. App. 453, 218 Pac. 769; and *Martin & Co.* v. *Maggard,* 206 Ky. 558, 267 S. W. 1102.

[11] We do not in any way derogate from the established principle that general reputation of a man's being a partner of another is not of itself admissible to hold one liable as a partner; it must be supported by evidence showing knowledge of the existence of the reputation and a failure to deny it under such circumstances as to create the estoppel. Likewise the holding out of a person by some one other than himself without his knowledge is not sufficient to bind him to a partnership liability. But here the reputation was naturally and necessarily brought about by his own conduct, and as said in one of the cases just cited was the consequence of his own act. The law holds a person to intend, have knowledge of, and to be responsible for the natural consequences of his own act or undertaking.

The question in the instant case was not merely whether reputation was known to the defendant, for the admissibility of such evidence here stands upon the broader basis, that it was naturally a consequence of the act of the defendant in making the agreement with

Thomas that he, Thomas, might hold him out as a partner. Mr. Hobbs should have expected as a matter of course that Thomas would act under the authority he had and would cause it to be known to all parties from whom he sought credit that Hobbs was his partner. And when such third parties extended credit to the firm upon Thomas' statement, they had a right to rely upon that statement because it was made with the authority of Hobbs. So that the testimony in question was admissible not only upon the ground that there was other testimony tending to show that Hobbs knew of the reputation concerning the partnership in business circles in Petersburg, but it was also admissible because he had in fact authorized the statements to be made and the reputation to be created.

In the case of *Hinman* v. *Littell*, 23 Mich. 484, Littell sued the defendants, Wiggins, Smith and Hinman, as partners, for the price of goods sold. The court said: "The main question in the case, as it comes before us, is whether there was any evidence tending to show that Smith and Hinman (two of the defendants claimed to be members of the firm) had held themselves out as partners with Wiggins." In deciding the case it was held as follows: "But the testimony of Wiggins, while its direct tendency was to establish a partnership in fact between the three defendants, tended also (and none the less on this account) to show that he was authorized by Smith and Hinman to act as a partner in the business with them, and to hold them out to the plaintiff and others as partners with him in that firm; and that he did, as thus authorized, represent and hold them out to the plaintiff (below) as such before the latter sent forward to the firm the goods, for the price of which the action was brought; and that the plaintiff, therefore, had a right to rely upon the truth of such representations in making

the sale. If, as this evidence of Wiggins tended to show, he was authorized thus to represent and hold them out, this, when he did so, was as much holding themselves out as such partners as if the same representations had been made by them in person. There was, therefore, evidence to be left to the jury upon this point."

In the instant case, the authority to represent to others that Hobbs was a partner did not rest merely upon parol testimony, but upon an instrument in writing to that effect. See also *Smith* v. *Hill*, 45 Vt. 90, 12 Am. Rep. 189. We think the objections to this class of testimony should have been and were properly overruled.

[12] Defendant excepted to the admission of the written statement made to the National Bank of Petersburg in 1922, signed by both Thomas and Hobbs himself, and to the preceding similar statements signed by Thomas only. It is urged in support of this exception that the plaintiff bank knew nothing of the dealings between Thomas and the National Bank, and also that the statement to that bank, signed by Hobbs in 1922, was made subsequent to the time Thomas borrowed the money in suit from the plaintiff bank. It is scarcely possible that, when Thomas at the instance of the National Bank called upon Hobbs to sign the statement required by the bank in 1922, Hobbs did not then acquire the information that Thomas had been for some years past carrying a partnership account with that bank, and that Thomas had been accustomed to signing similar statements. The statement of 1922 and the prior statements were admissible for several reasons. They were proof, finally, over the signature of Hobbs, that since 1900 there had existed a partnership under the style of J. W. Thomas & Company, consisting of himself and Thomas.

They tended to show that Hobbs considered that Thomas, by virtue of the articles of copartnership executed in February, 1900, had authority to declare to third persons dealing with the firm that he (Hobbs) was a partner in it.   They tended to establish that the declared intention of the agreement of February, 1900, to constitute Thomas and Hobbs partners as to third persons continued in effect during all the intervening years, and that the agreement had not been terminated.   The plaintiff bank put in evidence several yearly statements, made to it by Thomas, similar to the statements in question.   The evidence we are considering tended to prove the authority of Thomas to make such assurances to the plaintiff.   This evidence also was relevant on the question as to the construction to be given the words "credit in and about the said trade," for both Hobbs and Thomas were here seeking credit from a bank *under the partnership which had existed since 1900.*   In the circumstances of the instant case, this evidence was plainly admissible for the purposes indicated, and the exception to it is overruled.

[13]   The defendant excepted to the instructions given by the court and certain instructions offered on his part and refused.   At the end of the testimony the court gave the following instructions:

"1. The defendant, E. S. Hobbs, has introduced in evidence in this case a certain agreement made between him and J. W. Thomas, dated February 1, 1900.   With respect to this, the court instructs the jury that by the said agreement the said E. S. Hobbs authorized the said J. W. Thomas to hold him, the said E. S. Hobbs, out to the world as a partner for the purpose of giving the said Thomas credit in and about the trade therein mentioned.

"If the jury believe from the evidence that the said

J. W. Thomas held the said E. S. Hobbs out to the world as his partner in the firm of J. W. Thomas & Company, and the plaintiff had general knowledge or information of such holding out, or that the said J. W. Thomas, before securing the loans from the said plaintiff, represented to the said plaintiff that the said E. S. Hobbs was his partner in the business of J. W. Thomas & Company, and the said plaintiff loaned the said J. W. Thomas & Company the money represented by the notes sued on in this case on the faith that such partnership existed, then the said E. S. Hobbs will be liable as a partner as to such transaction.

"2. Testimony has been given by a number of witnesses in this case as it being an accepted fact or understanding in mercantile and financial circles in Petersburg that J. W. Thomas & Company was a partnership composed of J. W. Thomas and E. S. Hobbs. The court instructs the jury that such testimony cannot be considered for the purpose of establishing said partnership; but, if the jury believe by a preponderance of the evidence that such partnership did exist, such testimony can be considered by the jury as to whether the defendant, E. S. Hobbs, was a known partner of such firm, and as to whether credit was extended by the Virginia National Bank on the faith of his being a partner in the said firm.

"3. The jury are instructed that, under the law, each member of a partnership is the agent of the other members and that when created each partner has full power and authority to bind all the partners by his acts or contracts in relation to the business of the partnership, including the borrowing of money and the making and delivery of the notes of the partnership therefor; and as between the firm, and third persons dealing with them in good faith, it is of no consequence whether the part-

ner is acting in good faith with his copartners or not, provided the act done is within the scope of the partnership business and professedly for the firm."

[14] These instructions succinctly but fairly submitted to the jury the issue as to the liability of Hobbs as an ostensible partner. The first instruction places upon the articles of partnership a construction in consonance with the views already expressed in this opinion. We see nothing in the other instructions of which the defendant can complain. The second instruction is not clear in its purport and effect. It correctly states that testimony as to its being an accepted fact in financial circles that Hobbs was a member of the firm could not be considered at all for the purpose of establishing the partnership, if we presume the court meant an actual partnership. If by the rest of this instruction it was intended to tell the jury that if they believed an actual partnership did exist, such testimony could be considered by the jury to determine whether Hobbs was a known partner and whether credit was extended on the faith of his being a partner, then the instruction becomes meaningless because if Hobbs was actually a partner in the firm of J. W. Thomas & Company, he was bound for the partnership liabilities whether he was known or not. If the court intended by this instruction to submit to the jury the question of an actual partnership, we think this instruction should not have been given, as the evidence was not sufficient to justify it. Considering the overwhelming tendency of the evidence to establish the partnership by estoppel, the clear statement of the law in the first instruction, and the statement of the law as a whole resulting from considering the two instructions together, we see no possibility of the jury having been misled by any ambiguity in the second instruction, and if there were error in its being

given as written, it was harmless error.   Without setting out at length the fifteen instructions offered by the defendant, we find that some of them are not in accord with our opinion; some of them relate to the duties and liabilities arising *inter se* between actual partners and are not applicable here.   Some of them relate to the requirements of good faith and ordinary care on the part of the plaintiff in seeking the loans.   There is nothing in the evidence to impute any bad faith to the plaintiff, nor anything to put them upon inquiry.   The loans were made to J. W. Thomas & Company in the ordinary course of business, and the officers of the bank testified that they relied upon Thomas' statements as to who composed the partnership, upon the generally accepted fact that Hobbs was a partner with Thomas, and upon the reports made to and carried in the files of the mercantile agents, leaving the question of fact to be determined whether Hobbs was either directly or indirectly so connected with or responsible for these matters as to give the bank a right to rely upon them, and to estop him from denying their reliability.   Others declared that the borrowing of money was not authorized by the agreement of 1900, which was in conflict with the proper construction of the agreement.   A question was raised by the defendant's counsel in argument as to the knowledge on the part of the bank concerning the use to which the borrowed money was to be put.   The money was borrowed in the name of and for the use of the apparent partnership.   There was no duty upon the bank to inquire whether it was to be devoted to partnership purposes exclusively.   See *Commercial Bank* v. *Miller*, 96 Va. 365, 31 S. E. 812.   We do not think there was any error committed by the trial court, prejudicial to the defendant, in refusing the instructions offered by him.

The views we have expressed will sufficiently cover all the assignments of error without further specifically referring to each one of them. We are of opinion that the defendant has had a full and fair trial upon the real issue arising upon the evidence, and that the record shows no error. Therefore, the judgment of the trial court must be affirmed.

## ON REHEARING.

CRUMP, P., delivered the opinion of the court.

[15] In the argument upon the rehearing it was urged by the learned counsel for plaintiff in error that the court had, in its opinion, attached too great weight to the statement of the condition of the firm of J. W. Thomas & Company rendered to the National Bank of Petersburg in 1922, and signed by Thomas and also by Hobbs as the two persons comprising the partnership under that name; it was also again insisted that the statement was not relevant in this case as its existence was unknown to and did not influence the plaintiff bank, and was therefore inadmissible. That the statement was admissible as competent testimony in the case is too clear to be questioned. Mr. Hobbs' oral testimony in the case is brief, but in the course of it he denied that any arrangement in the nature of a partnership at any time existed between Thomas and himself. This written statement signed by him is in complete refutation of that testimony. Mr. Hobbs denied that the agreement of 1900 authorized Thomas to represent to any one that he was a partner in the concern. This written statement was a declaration

in writing to the contrary.   By this writing Mr. Hobbs declared, in effect, that the agreement of partnership made in 1900 had continued in force during the years intervening up to 1922, and had not been terminated. Mr. Hobbs had contended in his oral testimony that he understood the arrangement he had made with Thomas to have the effect only of allowing the firm to *buy goods upon his credit.*   By this statement Mr. Hobbs declared, over his signature in 1922, in effect that the agreement between the parties which had existed since 1900 authorized Thomas to *borrow money from the bank* upon the credit of the firm in which he was to be regarded as a partner, and to bind the firm by the obligations which he might give to the bank.   Whether this character of testimony was admissible at the time it was first offered, the plaintiff bank not having relied upon it, became immaterial, as it was made admissible by the evidence of Mr. Hobbs and the introduction of the written agreement between him and Thomas.

In order that the importance of this statement of 1922 to the ascertainment of the extent to which Mr. Hobbs had authorized Thomas to represent to third parties that Hobbs was a partner with him in the firm of J. W. Thomas & Company, it is here transcribed in full as it appears in the record:

"THE NATIONAL BANK OF PETERSBURG.

"Name (firm style):   J. W. Thomas & Co.
"Business;   General house furnishing goods.
"Location:   125 N. Sye.

"For the purpose of procuring credit from time to time, borrowing money and obtaining discounts from you, the undersigned declare the following to be an accurate, true and full statement of the financial con-

dition of the undersigned on January 1, 1922, understanding that the officers of the bank in granting said credits rely upon the accuracy of this statement.

"If at any time the condition of the undersigned should be materially changed, notice will be given you immediately in writing, stating the nature of such changed condition, and in the event of not doing so it shall be evidence that the condition is unchanged.

### *"Assets.*

| | |
|---|---:|
| "Cash in the National Bank of Petersburg ..$ | 300.00 |
| Accounts receivable from customers (good).. | 1,500.00 |
| Merchandise finished (how valued) inventory | 2,500.00 |
| Real estate in fee belonging to partners individually | 75,000.00 |
| Machinery and fixtures | 500.00 |
| Other assets and of what composed: | |
| Bonds, stocks, etc. | 50,000.00 |

### *"Liabilities.*

| | | |
|---|---|---:|
| Bills payable for merchandise | None | |
| Bills payable to others | None | |
| Bills receivable, discounted | None | |
| Open accounts, not due | | 500.00 |
| Open accounts, part due | None | |
| Mortgage or lien on real estate | None | |
| Chattel mortgage or other lien | None | |
| Confidential loans from friends or relatives (and from whom) | None | |

Please list real estate in detail on other side.

Contingent
Liability

| | |
|---|---|
| Accommodations on endorsement | None |
| Guarantees on bonds | None |

"Do you pledge, sell or otherwise dispose of any of your accounts receivable? No.

If so, to what extent are any of the accounts in above statement so disposed of? None.

General partners: J. W. Thomas and E. S. Hobbs.

Date and expiration of partnership Indefinite.

When was business established 1900.

Sales for year ending: 15,000.

Average term of sale: 30 days.

Amount of rent paid per annum: $112.50.

Amounts charged off for depreciation and bad debts.

I have none I consider bad; been very cautious who I sold this year.

Amount of Insurance: On stock $4,000.

Are accounts insured, and if so, in what company? None.

Date signed. January 1st, 1922.

"Please sign firm name: J. W. THOMAS & Co.

"J. W. THOMAS & E. S. HOBBS."

[16] Reading this entire statement in connection with the articles of partnership executed in 1900, we gain a fairly clear idea of the conception of both parties as to the arrangement between them and as to the effect of the so-called articles of partnership, not from dim memory under the stimulus of testifying *post litem motam*, however upright in intention the witness may be, but from documentary proof, the highest vehicle of proof. Unquestionably the parties who signed these two papers understood and intended that they should be taken by the business world as partners, that the property of Mr. Hobbs accounted as $75,000.00 in real estate and $50,000.00 of securities should be considered as a financial backing of the firm of J. W. Thomas & Company, in which he stated he was a partner, and that the partnership, acting through either one of the partners,

had authority to borrow money from banks and to execute the usual evidence of debt therefor in the partnership name. How can the court come to any other conclusion than that this was the construction placed by both parties themselves upon the agreement of 1900?

It is further contended by the learned counsel for plaintiff in error that Thomas perpetrated a fraud upon Mr. Hobbs when he obtained his signature to the financial statement, and points to the fact that Thomas, who doubtless prepared the statement, placed the liabilities of the firm at only $500.00, whereas they must have been greatly in excess of the amount. The only testimony given by Mr. Hobbs as to the statement consists in his evidence that he did not remember when or where he signed the statement, and he would not have signed it if the liabilities had been correctly stated instead of having been put down at only $500.00. But this is beside the mark. The question here is not whether he would have terminated the agreement. He had a right to do so at any time. The condition of the business, the possibility of his incurring loss by reason of his partnership agreement with Thomas, were matters at all times open to investigation by him, and he could have terminated his further liability any time at his pleasure. But the fact is that he acknowledged the authority of Mr. Thomas to continue the business under the agreement which made him liable as a partner, and his further authority to borrow an unascertained amount of money from a bank upon his credit as a partner.

[17, 18] By the first instruction given to the jury which is copied in the opinion of this court, the court instructed the jury that by the agreement between Hobbs and Thomas, Hobbs had authorized the latter

to hold him out to the world as a partner for the purpose of giving Thomas credit in and about the trade therein mentioned. The court then in the same instruction told the jury, in substance, that if Thomas represented to the plaintiff that Hobbs was his partner in the business of J. W. Thomas & Company, and the plaintiff in good faith loaned Thomas & Company the money, represented by the notes sued on, upon the faith of this representation, then Hobbs became liable as a partner upon the notes. It is insisted in argument on the rehearing that this instruction should have contained the further statement that before Hobbs could be held liable for such a representation made by Thomas, then the plaintiff "should have used such care in ascertaining the true facts as an ordinarily careful man would have used under all the circumstances of this case. It must have exercised reasonable care to know the truth as to the alleged partnership." An instruction of this character was offered by the defendant as a separate instruction, and was refused by the court. In support of this contention it is argued that the liability of one upon the ground that he has been held out as a partner is said to rest upon the doctrine of estoppel. Authorities are cited to the effect that where it is sought to hold a person bound by a state of facts not true or not authorized by him or based upon a misrepresentation of which he was ignorant, and his liability depends upon his silence or failure to speak when he should speak, then the party seeking to hold such person liable should exercise such care to ascertain the truth as a reasonably prudent man would do under the same circumstances. This argument was based upon the assumption that the case arising upon the record before the court is one in which an unauthorized and false statement had been made by Thomas

under such circumstances. Such is, however, not the case arising upon this record. It is true that there was much evidence introduced tending to show that there was a general holding out of Hobbs as being a partner in J. W. Thomas & Company, and there was evidence tending to show that Hobbs knew of this, and if he did not acquiesce in it he should, therefore, have taken steps to deny it. At the conclusion of the evidence, however, the duty rested upon the court to instruct the jury upon all the evidence before it. It was undisputed that when the business was started in February, 1900, Hobbs and Thomas entered into the agreement as to the conduct of the business, which was signed and sealed by both of them. The business was entered upon and conducted for a long period of years with that agreement in force, certainly up to 1922, for in that year the parties again in writing signed by them stated that the business was still being conducted under that partnership agreement. It became the duty of the court to construe the agreement of February, 1900, and to instruct the jury as to its meaning and effect. This the court did, in the first instruction, and in the opinion in the case we have concurred in the construction placed by the trial court upon that agreement. It is true that the defendant, Mr. Hobbs, stated that he did not intend by that agreement to make himself liable as a partner nor to authorize Thomas to represent him as a partner, and that he had forgotten the existence of the agreement. It is, however, a fundamental principle of law that a person cannot deny the effect of a writing intentionally and purposely signed by him in order to accomplish a definite object. The probative effect of the writing overweighs all parol testimony as to intention. As held by us in our opinion in this case, the agreement of February, 1900,

was intended to effect what was done in this case, that is, to pledge the credit of Mr. Hobbs with exactly the same effect as if he were a partner in J. W. Thomas & Company. The language is perfectly plain and it leaves no doubt in the mind of the readers of the agreement as to the object of the parties, the intention of the parties, and the necessary purport and effect of the instrument. It is true that as to any question that might arise concerning that agreement between Hobbs and Thomas, it would be held that its terms were such as not to constitute them partners *inter se*, or an actual partnership. There is no magic in the phrase *actual partnership* and it is used as a basis of a distinction between a party who has made himself liable to third persons for partnership debts, and the partnership rights and duties which may arise between partners in fact. If this agreement does not mean that Thomas should have perfect liberty to pledge the credit of Mr. Hobbs as a partner in the firm of J. W. Thomas & Company whenever he sought credit "in and about the said trade," then one would be at a loss to draw a contract which would effect that object.

[19] It is true, as stated in the books, that the liability of one not actually a partner with another rests upon the doctrine of estoppel. This, however, does not mean that it necessarily rests upon that branch of law relative to estoppel by silence, when a man stands aside and knowingly permits a false statement to be made concerning him. The cases cited in argument show that in the application of the doctrine of estoppel to the case of one sought to be held liable as a partner by holding out, there is a distinction between the cases where the holding out is shown to be by the consent or authority of the defendant, and the cases in which the liability is rested upon a statement shown

to have been untrue and which the defendant had failed to deny. In the case of *Morgan* v. *Farrel*, 58 Conn. 413, 20 A. 614, 18 Am. St. Rep. 282, cited for plaintiff in error, there was a written paper signed by the parties who it was alleged were partners. The court held that there was no suggestion in this paper that either one was or was to be the agent of the other. It contained no attempt to provide how the business was to be carried on as a joint undertaking between themselves, and the mere fact of a community of interest did not make a partnership. It further appears, on page 427 (20 A. 614) of the report, that the only fact which the defendant knew was that some one had wrongfully used his name on the note. It did not appear that he knew that the third person, with whom it was claimed he was a partner, was the man who signed the note. Under all the circumstances of that case, the court held that the duty of inquiry rested upon the plaintiff, because if the plaintiff had made inquiry he would have learned that there was no partnership and that the person signing the note had no authority to make such a statement and because the other circumstances of the case rather tended to arouse suspicion. In the case of *Anfenson* v. *Banks*, 180 Iowa, 1066, 163 N. W. 608, L. R. A. 1918-D, page 482, the evidence presented a case resting entirely upon a holding out by parties other than and without the knowledge or assent of the defendant, and while the opinion · is of considerable length, upon the evidence disclosed it is very plain that no case had been made out against the defendant. In the course of the opinion the court says in reference to the law of estoppel: "Examination of precedents shows that in general the claim of an estoppel *in pais* is based upon alleged postive acts, declarations, statements, or admissions

by the party sought to be charged; or upon the alleged silence of such party under circumstances in which as an honest man with due regard for the rights of others he was in duty bound to speak. It is manifest that cases of the first description are more easy of solution, for statements, declarations, and admissions are matters capable of direct proof, and their meaning and effect may be ascertained by application of the ordinary rules of construction. But when the party is sought to be charged because he was silent or because he has done nothing or because he did not do as much as in equity and good conscience he was bound to do, the party claiming the estoppel assumes a more different burden. The case before us is of the latter class." A careful reading of the opinion discloses that when the court says that by ordinary precaution and inquiry creditors can protect themselves from imposition, the court had reference to cases of the latter class, when there were circumstances of suspicion indicating that a duty of inquiry should rest upon the plaintiff. As said in Gilmore on Partnership, page 62: "It is plainly just that one who has held himself out as a partner should be held liable to those who have acted on such representation. The cases where such holding out has been shown are clear. The rule is the same where such holding out has been authorized by the defendant; for what is done by his authority is, in law, done by himself. Such authority may be shown by conduct as well as by words. Where, however, no authority can be shown, the question is more perplexing. One cannot be held for that for which he is in no way responsible, etc.

[20, 21] The estoppel involved in the case at bar is not that character of estoppel which closes the mouth of a defendant because he did not speak when he

should have done so.   It is rather in the nature of
estoppel by contract.   Mr. Hobbs, upon the evidence,
was estopped to deny all the just and reasonable con-
sequences that resulted from the agreement between
himself and Thomas.   The court properly construed
that instrument and it had no other recourse than to
tell the jury that if Thomas represented to the plain-
tiff that Hobbs was his partner, he had a right to do
so and was authorized by Hobbs to do so.   As soon
as that paper was introduced into the evidence, the
burden on the part of the plaintiff of relying solely
upon the holding out by others than Hobbs, and the
failure on the part of Hobbs to deny it, was to a great
extent relieved. The uniform partnership act adopted
in Virginia in 1918 (Laws 1918, c. 365) expresses with
accuracy the true rule as to the liability of one con-
senting to a representation that he is a partner of
another.   Its language is as follows:   "When a person,
*by words* spoken or *written* or by conduct, represents
himself, or *consents to another representing him to any
one*, as a partner in an existing partnership or with
one or more persons not actual partners, he is liable to
any such person to whom such representation has been
made, who has, on the faith of such representation,
given credit to the actual or apparent partnership."
Certainly the fact that Mr. Hobbs consented to his
being represented by Thomas as a partner with him in
the firm of J. W. Thomas & Company, is within the
scope of the written agreement between the parties, and
in fact was the very purpose of that agreement, because
Thomas could not have obtained credit for the partner-
ship upon the faith of Hobbs being liable for the part-
nership debts unless he represented Hobbs, as author-
ized by the agreement, to be a partner.

In *Thompson* v. *National Bank*, 111 U. S. 529, 4

S. Ct. 689, 28 L. Ed. 507, it was held that although a holding out is shown, still the defendant is not bound unless it was communicated to the plaintiff and he gave credit on the faith of it.   The lower court had held that such a general holding out had been established that the defendant became liable to all creditors of the apparent firm, although the plaintiff did not know of the fact; this was the ruling which the Supreme Court reversed.   The court refers with approval to the following language of Mr. Justice Parke in an English case:

[22] "No person can be fixed with liability on the ground that he has been held out as a partner, unless two things concur, viz, first, the alleged act of holding out must have been done either by him or by his consent, and secondly, it must have been known to the party seeking to avail himself of it.   In the absence of the first of these requisites, whatever may have been shown cannot be imputed to the person sought to be made liable; and in the absence of the second, the person seeking to make him liable has not in any way been misled."   In concluding the opinion the court sums up the doctrine, alluding to a New York case, as follows:

"And the judgment of the Court of Appeals in the later case of *Savings Bank* v. *Walker*, 66 N. Y. 424, clearly implies that in the opinion of that court a person not in fact a partner cannot be made liable to third persons on the ground of having been held out as a partner, except upon the ground of equitable estoppel, that he authorized himself to be so held out and that the plaintiff gave credit to him."

[23–25] The instruction in the instant case is in exact accord with those principles.

Both of the requisites essential to a recovery having

been submitted to the jury, what duty of inquiry rested upon the plaintiff? The proof of authority to Thomas to represent Hobbs as his partner, and thereby obtain credit for the firm, rested upon a contract in writing, the construction of which was a judicial function, and the court properly left to the jury to find whether Thomas, acting under this authority, communicated the fact of the partnership to the plaintiff and whether the plaintiff loaned the money on the faith of the existence of the partnership. All the authorities hold that where prior consent, knowledge or authority is shown, and the other requisites concur, then the estoppel is established. There is no foundation for an inference from the testimony that Thomas acted without authority in communicating the fact of Hobbs being a partner in the firm of J. W. Thomas & Company, or that he made a false or unauthorized representation in so doing. Learned counsel seemed to argue that despite the authority necessarily flowing from the agreement, and further confirmed, we should look to that instrument to ascertain whether the parties to it were actual partners *inter se.* But this is reasoning in a circle. When the estoppel prevails in favor of a creditor holding a person to ·a partnership liability, it is upon the assumption that there was no actual partnership, but by reason of the proof the party held liable is *estopped from denying that there was an actual partnership.* The party against whom the estoppel works becomes in the eye of the law, as to the creditor, an actual partner and will not be heard to deny it. Otherwise the entire doctrine of a partnership by estoppel, when a party sought to be held authorizes or consents to another holding him out to be or representing him as a partner, resting upon the principles established by the authorities and embodied in our statutes, becomes meaningless and nugatory.

Here the affirmative act of Mr. Hobbs in agreeing with Thomas that he would be liable for credit extended to the firm fixed his liability so long as the written agreement remained in force, and it was immaterial in what form Thomas conveyed the information that Hobbs was liable. Unless we close our eyes to the fixed meaning and purport of the language employed by the parties to the agreement of 1900, we cannot view that instrument in the ordinary light of a paper by a principal merely conferring authority upon an agent. The agency to bind the firm here, and so bind Hobbs, was not a mere agency conferred upon him by the agreement. On the contrary, the character of agency to bind the firm, possessed by Thomas, was the kind of agency which results from a partnership, in which each partner by an act within the scope of the partnership business binds the partnership and all the members.

These principles of the common law are restated in section 16 of our uniform partnership act: "When a partnership liability results, he is liable as though he were an actual member of the partnership," and further: "When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is the agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation." *McCaskey Register Co.* v. *Blakeney* (Mo. App.), 224 S. W. 62; *First National Bank* v. *Spangler*, 49 Cal. App. 133, 192 Pac. 874; *Boise, etc., Lumber Co.* v. *Sarrett*, 38 Idaho 278, 221 Pac. 130; *Dimon* v. *Romeo*, 99 Conn. 197, 121 Atl. 352.

The principle of law, upon which the decision in this case rests, was properly applied in the Michigan case of

*Hinman* v. *Littell,* quoted from in our opinion, and is in accordance with the reasoning of the courts in *Thompson* v. *First National Bank,* 111 U. S. 529, 4 S. Ct. 689, 28 L. Ed. 507, and other cases; that where one has authorized a statement or representation that he is a partner, he is bound thereby to a person to whom the statement or representation was made, and who relied upon it in dealing with the apparent partnership.

[26] The court instructed the jury in the third instruction given to it that each member of a partnership has authority "to bind all the partners by his acts or contracts in relation to the business of the partnership, including the borrowing of money and the making and delivering of the notes of the partnership therefor; and, as between the firm and third persons dealing with them in good faith, it is of no consequence whether the partner is acting in good faith with his copartner or not, provided the act is done within the scope of the partnership business and professedly for the firm.

The principle of law enunciated in this instruction is well settled and is applicable to all commercial or trading partnerships; and it is clear that J. W. Thomas & Company were engaged in a commercial or trading business. Without seeking other authority, it is sufficient that the doctrine embodied in the instruction has been acknowledged in Virginia. In *Commercial Bank* v. *Miller,* 96 Va. 357, 31 S. E. 912, the court, quoting with approval from Daniel on Negotiable Instruments, holds it to be "settled law" that "the borrowing of money and negotiation of bills and notes being incident to, and usual in, the business of copartnerships formed for the purpose of trade, it follows that when a copartner borrows money professedly for the firm and execution therefor a negotiable instrument

in the copartnership name, it will bind all the partners, whether the borrowing were really for the firm or not, provided the lender is not himself cognizant of the intended fraud, and the burden will not be thrown on him to show that he was not cognizant of such fraud, or to prove value given for the paper."

[27] In oral argument on the rehearing it was contended that Thomas had perpetrated a fraud upon the defendant in borrowing so large a sum, when the statements of the condition of the business showed that the sums loaned were out of proportion to the amount of business done by J. W. Thomas & Company, and therefore the bank should have taken cognizance of this condition. The evidence from financial and business men is overwhelming to the effect that in business, financial and trade circles in Petersburg the concern of J. W. Thomas & Company was considered to be a partnership composed of Thomas and Hobbs, and that Thomas was in the habit of borrowing from banks and trading generally upon the faith of such a partnership. Both the mercantile agencies, for many years prior to the death of Thomas, carried this information with the usual items as the financial worth of the partners individually in their reports. As the reporter for Dun's agency testified: "The general information, from sources that I have consulted from time to time and presumed to be well informed sources, was to the effect that it was composed of the two individuals I have mentioned, Mr. J. W. Thomas and Mr. E. S. Hobbs. That was the general understanding of the prominent business concerns, banks, insurance companies, real estate agents, wholesale houses, etc., that we have consulted at times." There is some direct evidence tending to show that Mr. Hobbs knew Thomas was carrying on the business upon the faith of such a partnership, but.

this was denied by Mr. Hobbs, and was therefore for the jury. The inference from the evidence is that the universal understanding as to the partnership resulted from statements made by Thomas and the business as conducted by him, and that Thomas was acting with the assent and authority of Hobbs growing out of the agreement between them. In 1919 Thomas approached the president of the plaintiff bank for the purpose of opening an account with the bank in the name of J. W. Thomas & Company and having credit extended to them. Thomas stated to him that he desired to make loans from the bank to pay off indebtedness of the partnership to the National Bank of Petersburg. Mr. Wright, the bank's president, knew both Mr. Thomas and Mr. Hobbs intimately, he testifies. He knew of the general understanding among the business men of the city that Thomas and Hobbs were the two partners constituting the firm of J. W. Thomas & Company. Upon inquiry of Thomas, the latter told him that the firm was composed of himself and Hobbs. Upon consulting the reports of the two mercantile agencies, this was further confirmed. He then consented to extend credit to the firm. We find nothing in the testimony to arouse any suspicion on the part of the bank's president that Thomas was in any way intending to deceive him or to defraud his partner, as Thomas was considered a reputable business man of the community, and the president knew he was engaged in the crockery business, and he knew also that Thomas' financial means were negligible and that Hobbs was a man of comparative wealth; he testified that credit was extended on the strength of Mr. Hobbs' financial condition. The notes in suit, which by extension and renewals resulted in the indebtedness due at the time of Thomas' death, originated during a period commenc-

ing in November 1920. A very brief statement of the condition of J. W. Thomas & Company for the year ending January 1, 1920, was rendered to the bank, as follows:

| | |
|---|---:|
| "Inventory_____ _____$ | 4,500.00 |
| Open accounts_____ | 1,500.00 |
| Store fixtures_____ | 500.00 |
| Real and personal property_____ | 100,000.00 |
| Bonds, stocks, etc. _____ | 50,000.00 |
| Life insurance_____:____ | 30,000.00 |

"$   186,500.00."

The only liabilities given was the amount of $450.00 due on open accounts, and "deduct our accommodation from the above."

In January, 1921, the bank was furnished with the following statement:

"For the purpose of procuring credit with the above named bank on our negotiable paper, we furnish the following as being a fair and accurate statement of our financial condition on the 1st day of January, 1921:

"*Assets.*

| | |
|---|---:|
| "Cash on hand and in bank_____$ | 1,000.00 |
| Accounts receivable—good_____ | 1,500.00 |
| Accounts receivable—doubtful_____ | 19.85 |
| Accounts receivable—bad_____ | 30.00 |
| Real estate_____ | 90,000.00 |
| Fixtures_____ | 500.00 |
| Merchandise—how valued: Estimated market value_____ | 4,000.00 |
| Other accounts: | |
| Stocks and bonds_____ | 50,000.00 |
| Life insurance_____ | 25,000.00 |

$   172,049.85

*"Liabilities:*

"Notes payable for merchandise............None
  Notes payable to banks....................$   16,600.00
  Notes payable to individuals..............None
  Open accounts payable........................   387.56
  Mortgages on real estate...................None
  · Mortgages or liens on personal prop-
     erty..................................................None

  Total liabilities..................................$   16,987.56
  Net worth...........................................·   155,062.29

  Total................................................$   172,049.85
"Names of partners:  J. W. Thomas & E. S. Hobbs.
How long in business, 20 years.
Contingent liability, such as accommondation endorsement, etc.  None.
"Amount of insurance on stock.............$   4,000.00
  Amount of total sales per annum.......   25,000.00
  Gross earnings per annum....................   7,600.00
  Amount of expenses per annum..........   4,000.00
  Net earnings per annum.......................   3,600.00
                    "(Signed) J. W. Thomas & Co.,
                    "Per J. W. Thomas."

A similar statement rendered in January, 1922, is in the main the same as in 1921, except the cash on hand is listed at $600.00, merchandise at $2,500.00, and the life insurance is omitted so that the total assets are placed at $155,100.00; the individual worth of the partners is placed at $130,000.00, the total sales per annum at $15,000.00, the gross earnings at $5,000.00, and the net earnings at $2,000.00.  Mr. Thomas died in October, 1922.

The bank officials probably knew when the loans originated that the business conducted by J. W. Thomas

& Company was not very extensive, and these statements show that the business was not progressing, although they show a large amount of assets amply authorizing a loan of $18,000.00 or $19,000.00. Whether any officer of the bank examined these statements with care, or examined them at all, does not appear. The president of the bank testified he extended credit to the firm in reliance on Mr. Hobbs' financial ability. In answer to questions concerning his knowledge of the purpose of the firm in making loans from his bank, he says:

"Q. Mr. Wright, at the time those loans upon these notes were obtained from the Virginia National Bank, was there any statement made to you as an officer of the bank as to what was to be done with the money, the proceeds of the notes?

"A. Mr. Thomas told me that it was to pay the National Bank.

"Q. To pay the National Bank?

"A. Yes, sir.

"Q. Do you know to whose account the money was placed?

"A. To J. W. Thomas & Company."

Mr. Wright was placed upon the stand on three different occasions during the course of the trial, and on none of them was he cross-examined at all. His testimony remains undisputed and therefore the facts are that the bank loaned the money in the regular course of business, in perfectly good faith, to a firm of known financial ability, and for a purpose regularly within the scope of a trading partnership, *i. e.,* to discharge indebtedness it owed.

We find nothing in the record to impugn the good faith of the bank officials, or to put them on their guard, otherwise than to satisfy themselves that the loans could and would be repaid by the firm.

The learned counsel for the plaintiff in error in the case has argued so earnestly and exhaustively his insistent contention that Hobbs is not shown to be a partner by estoppel, that we have felt constrained to deal with that question at considerable length in our original opinion and in this discussion of the case on rehearing; although it seems after all that our disagreement with that view is based upon the fundamental principle that one person cannot put another in a position to mislead third parties and then disavow the results of his act.   We have shown that no duty of inquiry rested upon the bank to ascertain whether Hobbs was a partner in fact, because Hobbs had consented to Thomas making such a statement.

This duty of inquiry, however, may arise in another phase of the case brought to our attention in the oral argument on the rehearing.   By the record brought to this court, and the verdict of the jury, it is placed beyond further dispute, and must be regarded as settled law of the case that Hobbs is to be taken, in considering his liability for the debt sued upon, as a partner with Thomas in the firm of J. W. Thomas & Company, and as a partner in fact.   There was evidence tending to show that the officialism of the bank, when the loans of money commenced in November, 1920, knew the business of J. W. Thomas & Company was small, and that the large advances made to the firm seemed out of proportion to the necessities of the business conducted on the scale appearing in the statements made to the bank in January, 1921, and the following year.   Was there anything in the amounts of money borrowed, under all the circumstances shown in evidence, to arouse suspicion on the part of the bank that Thomas was exceeding the authority, which was conferred upon him as a partner, to bind the partnership?   The firm was a

commercial or trading partnership, and as has been pointed out it seems settled in Virginia that in such a partnership any partner may bind the firm by borrowing money and executing a note therefor in the partnership name. This rule seems universal. 1 Rowley on Partnership, sections 423, 424. As there said, in section 424:·

[28] "In general, a commercial partnership will be liable for money borrowed by one of its members on the credit of the firm, for commercial partnerships are engaged in buying and selling, and within the scope of buying and selling, it is an incident of the business to borrow money, therefore the power to borrow money for the firm and the authority to bind the firm by the loan is implied in each partner. Moreover the lender, in order to charge all of the several partners, is not required to see that the money thus borrowed is applied to partnership purposes. All that is necessary is that he act in good faith and without knowledge, actual or constructive, that the borrower intends to use the money to further his own individual interests. But if the lender, at the time of making the loan, knows or has reason to believe that the partner is seeking to obtain money for his individual benefit, or that the transaction is out of the ordinary course of business, then the firm is not liable."

What is "out of the ordinary course of business" must depend upon the circumstances of each case. If Thomas had undertaken to purchase a coal mine and had executed the note of the partnership in payment of the price thereof, the transaction would have been on its face beyond the scope of his implied authority as a partner in the firm dealing in chinaware and like articles, although he had implied authority generally to borrow money for the firm.

[29, 30] The presumption is that money borrowed in the partnership name was borrowed for partnership purposes and in the course of the business conducted by the partnership. If by reason of the unusually large sums borrowed and the knowledge the bank officials had of the business and of the partners and other circumstances, the defense is made that notice should be imputed to the bank that the loans were not intended for the partnership business, and that the bank should have made inquiry, and that such inquiry would have developed that the money borrowed was not to be used in fact for partnership purposes—then the establishment of such defense is upon the defendant. *Lind* v. *Crowley,* 29 Kans. 756; *Sheldon* v. *Bigelow,* 118 Iowa 586, 92 N. W. 701; *Chicago Trust, &c., Bank* v. *Kinnare,* 174 Ill. 358, 51 N. E. 607; *First National Bank* v. *Webster,* 130 Minn. 277, 753 N. W. 736; *National Shawmut Bank* v. *McGlinn* (Mass.), 150 N. E. 151; *Union Nat. Bank* v. *Neill,* 149 Fed. 711, 79 C. C. A. 417, 10 L. R. A. (N. S.) 426.

The power of a partner to bind the partnership is thus expressed in the uniform partnership law, Code (ed. 1924), section 4359 (9):

"(1) Every partner is an agent of his partnership for the purpose of its business and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

"(2) An act of a partner which is not apparently for the carrying on of the business of the partnership in the

usual way does not bind the partnership unless author-
ized by the other partners."

In the instant case it is clearly established that
Thomas had general power to bind the partnership by
borrowing money, and to execute a note therefor, *in
carrying on the business in the usual way.* Were the
notes in question here so executed, or do the large sums
borrowed, apparently unnecessary for the small busi-
ness, indicate to a prudent money lender otherwise, or
that there was something amiss about the transaction.

In *Coller* v. *Porter*, 88 Mich. 549, 50 N. W. 658, the
plaintiff loaned money to a partnership in which her
brother was a member, and it was contended that the
brother had secured the loan for his personal use. The
court applied the principles of law thus:

"The jury were also instructed, and we think cor-
rectly, that when partners were engaged in such a
grocery business as this was, where they were doing a
wholesale and retail business, they had the right to
borrow money for the necessary purposes of the busi-
ness; but, if it was not borrowed for the necessary pur-
poses of the firm, the plaintiff could not recover, if she
knew it was not borrowed for such purposes; but she
had a right to rely upon the implied power of Coller
to borrow money, and if she loaned the money in good
faith, and did so without knowledge or notice of such
facts as would lead an ordinarily prudent person to
suspect that the loan was for her brother, she had the
right to recover."

In 1 Joyce on Defenses to Commercial Paper (2nd
ed.), section 175, the author deals with the ostensible or
apparent authority of a partner to borrow money, and
there says:

"If one of several partners obtains a loan of money
for his individual use, by giving the note or check of the

firm, but without their authority, the other partners will nevertheless be bound thereby unless there be something in the transaction to induce the lender to suspect that the money is not borrowed for their benefit or the circumstances were such as to put him upon inquiry."

[31, 32] Without undertaking to state the evidence in detail, there is, in our opinion sufficient testimony in the record to have allowed the jury to pass upon the following two questions, viz: (1) Whether, in making the loans from the plaintiff bank, Thomas was borrowing for his personal benefit, or otherwise not for the reasonable requirements of the firm's business, and without the knowledge of and in fraud of his partner, Hobbs; (2) whether under all the circumstances in evidence and with the knowledge which may be shown to be possessed by the bank and by Hobbs respectively, notice should be imputed to the bank that the transactions of Thomas in making the loans were suspicious and should have put the bank upon inquiry, and inquiry would have disclosed that Thomas was exceeding his implied power as a partner without the assent of Hobbs. In the event of an affirmative answer to these two questions, the verdict should be for the defendant, otherwise for the plaintiff. We will reverse the case and remand it for a new trial to be had only upon the said two issues, all other questions in the case to be taken as settled in accordance with the views expressed by this court. The first instruction given by the court practically excluded from the jury the consideration of these issues, though otherwise correct and in accord with the general rule enunciated in *Commercial Bank* v. *Miller, supra.* An order will be entered setting aside the verdict of the jury and reversing and remanding the case for a new trial as indicated.

*Reversed and remanded.*

CHRISTIAN, J., dissenting:

The legal principles involved in this case are of such public importance and I differ so radically from the majority of the court, that I feel it my duty to discuss the case in detail.

This was a proceeding by notice of motion brought to the April term, 1925, of the court, by the Virginia National Bank of Petersburg, Virginia, against Eugene S. Hobbs surviving partner of J. W. Thomas, deceased, and himself, trading as J. W. Thomas & Company, and Willie H. Thomas as endorser, to recover $19,390.00, evidenced by eighteen negotiable notes executed by J. W. Thomas in the name of J. W. Thomas & Company and endorsed by his wife, Willie H. Thomas. There was a verdict after trial for $19,120.52 with interest from various dates when the notes became due and payable. The defendant, Hobbs, moved the court to set aside the verdict and grant him a new trial because there was no evidence to sustain the verdict and for errors committed by the court during the trial, and in giving and refusing certain instructions, but the court overruled the defendant's motion and entered up judgment upon the verdict. Whereupon the case, with all exceptions, was brought up for review by writ of error.

Hobbs filed a plea with affidavit denying the partnership, and that he had ever held himself out as a partner in the business of J. W. Thomas & Company. Upon this plea issue was joined, and the case tried. Thus the burden of proof was on the plaintiff to prove that there was a contract of partnership, express or implied, between J. W. Thomas and Eugene S. Hobbs whereby they agreed to combine their property or services as principles in the business for mutual profit.

The record discloses that in February, 1900, J. W.

Thomas, who had theretofore been manager for Mrs. Winn in the conduct of the crockery and chinaware business, known as the "China Palace," bought out this business and thereafter conducted it under the name and style of J. W. Thomas & Company. The business was small; the fixtures and stock carried amounted to about $4,500.00. Hobbs' name never appeared as a partner on the stationery, advertisements or in any way as a member of the concern, and he took no part in the management or conduct of the business. He was a farmer living thirty or forty miles from Petersburg and visited that city about once a month. When there he called at Thomas' store, because Thomas was his brother-in-law. The firm name Thomas adopted was J. W. Thomas & Company, and the name of Hobbs never appeared in the concern, and from their course of dealing or practice, he was a silent partner, if a partner.

After the notes were introduced and proven to have been signed and negotiated by Thomas, who had committed suicide in September, 1922, B. T. Kinsey, cashier, was put on the stand to prove the notes and their protest as to the endorser, and after testifying as to those facts, he was asked if he knew who composed the firm of J. W. Thomas and Company. He stated that he did. It was composed of J. W. Thomas and E. S. Hobbs.

The defendant objected to the question and answer as a mere opinion of the witness, but his objection was overruled, and the evidence was permitted to go to the jury. This was clearly prejudicial error as witness testifies that he knows of a contract, but fails to show how he knew it, or anything about the partnership contract. His knowledge that he claimed to have was merely an opinion or belief, and has no probative effect,

and should been have excluded. "The existence or non-existence of a partnership is not to be established by *the opinions* or the belief of parties to a litigation or of their witnesses." 30 Cyc., page 406, and cases cited in note 74.

G. C. Wright, president of the plaintiff bank, was then put upon the stand and testified that he extended the line of credit to J. W. Thomas and Company in 1919 upon the financial ability of E. S. Hobbs, and that the only evidence he had of Hobbs being a partner in the firm of J. W. Thomas & Company was the statement of Thomas that "the firm was composed of J. W. Thomas and E. S. Hobbs," and the mercantile reports. This was all the evidence that the bank had that Hobbs was in any way connected with the concern, and upon that statement the credit was given and continued until the day of Thomas' death. The defendant objected to the admission of this evidence as illegal. A person cannot be proven to be a partner of another by the statements of that party not made in his presence. This evidence was objected to and admitted over the protest of defendant.

It is true that the court said it would admit it for the present, but the plaintiff never claimed or showed any approval or ratification of the statement by Hobbs, nor did the court ever strike out this improper evidence upon which its whole claim was based. The defendant had the plain right to have that statement excluded at the time unless the plaintiff claimed it could show subsequent approval or ratification after knowledge of all the facts, which it did not do or attempt to do.

The law upon this subject, without dissent, is laid down in 20 Ruling Case Law, page 847, section 53:

"The fact that a certain person was a member of a partnership, and therefore liable for the firm debts,

*at a specific time*, may be proved by his admissions that he was a partner. But the declarations of one partner, not made in the presence of his copartner, are not competent to prove the existence of a partnership between them as against such other partner." *Owensboro Wagon Co.* v. *Bliss*, 132 Ala. 253, 31 So. 81, 90 Am. St. Rep. 907; *Chapman* v. *Wilson*, 1 Rob. (40 Va.) 267.

In 30 Cyc., page 409, citing in note 91 cases from practically every jurisdiction in the United States as authority, the law is stated as follows: "Admissions of a partnership's existence by one partner cannot be given in evidence against an alleged copartner unless made in the latter's presence or unless the latter authorized or assented to the admission, or has adopted or ratified it." Partnership being a mutual agency the authority or assent must be proven independently of the statement of the partner before the admission can be received in evidence.

Wright is conclusively presumed to know the law, and he was legally bound to make inquiry into the authority of Thomas before extending credit upon his statement that Hobbs was his partner. Failing to do so, the bank gave credit to Thomas alone, unless Hobbs was an actual partner, and this statement should have been excluded when offered. "Such admissions or representations are not competent evidence to establish the existence of the partnership relation, nor the extent of the maker's authority to bind the firm." 30 Cyc., 523.

The reason for the rule of law is, that to admit such evidence would open a door to fraud; for a trader in poor credit would be tempted to state that a man of wealth was his partner in order to secure credit (as was done in the instant case) and his creditors

would be tempted to further it, so that they might collect their debts.

The plaintiff was allowed by the court to introduce, by C. E. Plummer, president of the National Bank of Petersburg, a statement dated January 1, 1922, signed by Thomas and Hobbs, and secured by Thomas at the request of the National Bank, which did not state the true indebtedness of J. W. Thomas and Company but which was never seen by the plaintiff's officers until after the death of Thomas, as evidence that Hobbs was a partner of Thomas. The court, after admitting this evidence, refused to permit Hobbs to explain the circumstances under which this statement was signed, and who denied ever signing it.

The court also allowed B. B. Jones, president of the Union Trust Company, to testify to a conversation with Hobbs after the death of Thomas in which he admitted that he was a partner of Thomas. "The fact that a certain person was a member of a partnership and therefore liable for the firm debts, *at a specific time*, may be proved by his admissions that he was a partner." 20 R. C. L., section 53, page 847; *Herman Kahn* v. *Bowden*, 80 Ark. 23, 96 S. W. 126, 10 Ann. Cas. 132; *Dawson* v. *Pogue*, 180 Ore. 94, 22, page 637, 6 L. R. A. 176. But before this admission is admissible the plaintiff must show that he relied on the same and gave credit on the faith of the statement. The plaintiff never heard of these admissions for years after the credit was extended, and it is not shown that Hobbs admitted that he was a partner when the loans were made. Hence the evidence should have been excluded.

A number of witnesses, over the objection of the defendant, were permitted to testify as to their understanding, and the understanding in business circles or general reputation in Petersburg that Hobbs was a

partner of Thomas, that the mercantile agencies so reported, and some that it was their opinion that they were partners. None of these witnesses showed that Hobbs was in any way responsible for these reports, understandings or opinions, or that he had ever heard of any of them. They were all merely hearsay, and improper evidence to establish the fact that Hobbs was a partner of Thomas, or that he had held himself out as such partner, or that the plaintiff had given the credit by reason thereof. The evidence being illegal should have been excluded from the jury, as highly prejudicial to the defendant and without probative value to establish the fact in issue. "Mercantile agency reports, general reputation, common notoriety or understanding are inadmissible in evidence to establish the existence of a partnership for such evidence is merely hearsay." 20 R. C. L., section 315; 30 Cyc., page 407.

It should be noted that the notice of motion charges Hobbs as an actual partner and there is no allegation or count charging him as a partner by holding out or equitable estoppel. The proof of the latter, for fixing liability upon a person as a member of a partnership, is very different from that required for an actual partnership, and should be alleged, but no point of this was made by Hobbs, but his plea denied that he was a partner of Thomas either actually or by holding out. This principle is adverted to simply because some cases have, upon certain peculiar conditions, permitted evidence of general reputation or notoriety to establish a partnership by holding out or equitable estoppel, but the great majority of courts hold that general reputation is inadmissible to establish the existence of a partnership between individuals. An actual partnership certainly cannot be established by common understanding, notoriety or general reputa-

tion. General reputation cannot prove the existence of a fact and at the same time be evidence of its own truth.

*Reputation* is a question which plays a larger part in the matter of an alleged ostensible partnership than an actual partnership, but barring an occasional loose or inapt expression to be found in a few decisions, the rule that a partnership is not to be proved by current gossip or vague general understanding is applicable to all partnerships whether actual or ostensible. *Anfenson* v. *Banks*, 180 Iowa 1066, 163 N. W. 608, L. R. A. 1918-D, 482-496, note (1a) page 505; *Central R., &c., Co.* v. *Smith*, 76 Ala. 572, 52 Am. St. Rep 353. This almost universal principle of law has been adopted in Virginia by the uniform partnership act.

In the *Anfenson Case*, decided in 1917, the rule in reference to general reputation to prove partnership is reviewed and it is shown by the large majority of the courts to be as above set forth, and the note to this case in L. R. A. 1918-D, page 505 and (1a), gives a list of the cases, and there is hardly an exception to the rule. To allow one person who desires to improve his credit to circulate, without authority, a report that some person of wealth was his partner, and thereby give rise to a reputation of the existence of such partnership relation, and then hold that such reputation may be put in evidence to prove its own truth, would assuredly not appeal to one's natural sense of justice, nor have a tendency to enhance one's respect for the law. The Connecticut court holds that to admit such evidence would be to open the door to fraud: "For a trader in poor credit would be tempted to circulate the rumor that a man of wealth was a member of his firm in order to help his credit, and his

creditors would be tempted to further it so they might collect their debts." *Brown* v. *Crandall*, 11 Conn. 92. If such be not the law, whose estate would be safe?

The burden of proving the existence of a partnership is on him who alleges and relies on the fact of its existence, or the facts that constitute an equitable estoppel. 20 R. C. L., section 54, 30 Cyc., page 403. It will be observed that there is no evidence in this case, from the plaintiff, to take it to the jury, as the credit was extended entirely upon the statement of Thomas that Hobbs was his partner, and Wright made no inquiry or investigation of the truth of that statement, although Hobbs could have been easily reached by telephone, and he saw him once a month at the meetings of another financial institution.

"Where a business is being conducted by a number of persons who are owners of that business, it is necessary that each of the persons so owning it shall be invested with power to do all things in the regular, necessary and usual course of the business, and when they do so it is necessary and proper that those who deal with them shall be protected. These considerations led the courts to require of persons who deal with partnerships to take notice of the partnership, its business and the general course of that business, as the public owes to the partnership the same fidelity, when dealing with its individual members, that the partnership owes to the public in such cases." *Morrison* v. *Austin State Bank*, 213 Ill. 472, 72 N. E. 1109, 104 Am. St. Rep. 225-228.

Notwithstanding the plaintiff had not made out a *prima facie* case, the defendant was required to prove that he was not a partner nor liable in any way upon the notes. He went upon the stand and denied that he was a partner with Thomas; that he had never held

himself out as such or authorized Thomas to do so, or ever knew that he was being held as a partner by Thomas. He testified that Thomas was his brother-in-law and in order to help him, he had executed a certain paper, bearing date on February 1, 1900, and which he had never seen since, until after the death of Thomas, when he qualified as his administrator and found it among his papers and then produced the paper in court. This paper was read to the jury as follows:

"Articles of agreement made and entered into this first day of February, 1900, between E. S. Hobbs, of the one part, and J. W. Thomas, of the other part;

"Whereas, the said E. S. Hobbs and J. W. Thomas have agreed, and by these presents do agree, to become copartners together in the trade of china, crockery ware, willow ware, and kindred articles, and all things thereto belonging, and also in buying, selling, and retailing all sorts of wares, goods and commodities belonging to said trade, which said copartnership is to continue from the date hereof, for and during the pleasure of the said parties, to be terminated at any time by either of them; and,

"Whereas, the said copartnership is formed for the sole accommodation of the said J. W. Thomas for the purpose of giving him credit in and about the said trade; and,

"Whereas, the said E. S. Hobbs is to have no interest in any of the property or profits of the said copartnership, and is to put in no money, goods or stock of any kind in the said copartnership;

"Now, therefore, this agreement witnesseth: That for and in consideration of the premises, the said J. W. Thomas doth convenant and agree to and with the

said E. S. Hobbs, that he, the said J. W. Thomas, will pay all of the debts contracted and to be contracted by the said copartnership in and about the said business, and also, that all such losses as shall happen in the said joint trade by bad debts, all commodities or otherwise, and all wages, charges, expenses, rents, purchases and payments whatsoever, relative to and in the said joint trade, shall be paid and borne by the said J. W. Thomas; it being understood and agreed that all such gain, profit and increase that shall come, go or arise, for or by reason of the said joint trade, shall be, during the said copartnership, wholly and solely the property of the said J. W. Thomas. And the said J. W. Thomas doth further covenant to and with the said E. S. Hobbs that all of his, the said J. W. Thomas' estate, real, personal, and mixed, shall be applied to the payment of any and all debts due or to become due during the said term by the said copartnership, and that he will indemnify and save harmless the said E. S. Hobbs from all liability of any kind whatsoever, which at any time may grow out of the said copartnership; and that he will repay any and all sums which the said E. S. Hobbs may be called upon to pay by reason of the said copartnership. And the said J. W. Thomas doth hereby waive the benefit of his homestead, and all other exemptions, as to this obligation.

"Witness the following signatures and seals:

"E. S. Hobbs       (Seal)
"J. W. Thomas   (Seal)."

When the evidence was concluded, the plaintiff asked the court by its instructions to construe this agreement as making Hobbs and Thomas actual partners, and the court so construed it. This was error, as the agreement does not contain the most

essential element to constitute a partnership, that is, that Thomas and Hobbs were to carry on the business as co-owners for profit. The older English and American doctrine was that an agreement to share the profits of a business or enterprise constitutes a partnership as to third parties, whatever may have been the relation of the parties as between themselves, but the modern and generally accepted doctrine, approved by the uniform partnership act which is the law in Virginia, is that except where the parties are partners by estoppel, *persons who are not partners as to each other are not partners as to third persons.* "The modern test of a partnership is a community of interest, a sharing in the profits and losses as such; the existence of the mutual relationship of principal and agent, and an intention on the part of the persons interested and uniting in the prosecution of the common enterprise to become and act as partners, are the proximate tests as to the existence of a partnership between them; what constitutes a partnership being a question of law for the court, while the question as to the existence of the constituent elements of a partnership is one of fact for the jury." 17 Am. & Eng. Ency. Law (1st ed.), page 830; Cÿc. page 366; 20 Ruling Case Law, page 28; *Beauregard* v. *Case,* 91 U. S. 134, 23 Law Ed. (U. S.) 263; *Paul* v. *Cullum,* 132 U. S. 539, 10 S. Ct. 151, 33 Law Ed. (U. S.) 430.

Whether the agreement constitutes a partnership depends upon their intention as legally ascertained. If the rights and obligations created by the terms of the contract are those of partners, such will be deemed to have been their legal intention, without regard to their declared purpose, and if their contract is inconsistent with the partnership relation, they are not partners, *even though they may have so called them-*

*selves.* 17 Am. & Eng. Ency. Law (1st ed.) 833; *Burnett* v. *Snyder,* 76 N. Y. 344, 20 R. C. L. section 36; *Wagner* v. *Buttles,* 151 Wis. 668, 139 N. W. 425, Ann. Cas. 1914B, 144, note 115 Am. St. Rep. 415.

Construing the agreement of February,1900, between Hobbs and Thomas in the light of the law, there is not contained the necessary elements therein to constitute a partnership and none of the powers or liabilities of partners are conferred thereby on either of them.  If the word copartners had not been used by the draftsman no question as to its purpose could arise.  Therefore, instruction number two and the latter part of number one which left to the jury to find that *such partnership did exist* was erroneous, and said agreement conferred no power upon Thomas to execute notes for borrowed money upon the credit of Hobbs.  It is true that where there is an actual partnership for the purpose of conducting a mercantile business, each partner has authority to borrow money for use in the business *as an incident* to their relation as partners. But if there is no partnership, no such power to execute notes for borrowed money can exist, hence instruction number three was not applicable to this case and it was error to give the same.

The plaintiff's president is conclusively presumed to know the law of partnerships, and that he could not justify the loan to Thomas, and make such loan the personal obligation of Hobbs upon the mere statement of Thomas to Wright that Hobbs was his partner, and Wright should have known that he could not rely upon that statement, as a basis of credit, and if he had investigated and known the truth he would have hardly loaned a cent on that agreement, and Hobbs if asked would have told him he was not a partner.

It is a rule of justice, as well as law, as stated by the

Supreme Court in *Commercial Bank* v. *Miller*, 96 Va. 357-369, 31 S. E. 812, 816, that "A statement by a person that another *is his partner* in business, which induces the person to whom the statement is made to give credit upon the faith and credit of the person represented to be a partner, *will bind such person, if the statement be true, but not if untrue."* Hobbs not being a partner of Thomas, and the latter's statement to Wright that he was being untrue, there can be no recovery against Hobbs, as an actual partner.

When the agreement of February 1, 1900, was introduced in evidence by Hobbs, the plaintiff claimed that if the agreement, with the evidence produced, did not make him liable on the notes as an actual partner, nevertheless it was authority to Thomas to hold him out to the world as a partner and thereby execute the notes in suit for the money loaned Thomas. It is hardly necessary to state that partnership is a branch of the law of agency, and if a party lends money upon the mere statement of a person that another is his partner, or he has authority to represent another as his partner, the lender acts at his peril, and should it turn out that there was no consent to the representation or the borrower exceeded his apparent authority, the person represented as a partner is not liable. When the question of an agent's or partner's consent to representations or authority is put in issue, and such claimed consent or authority is in writing, it must be found within the four corners of the writing, construed in the light of the circumstances and subsequent conduct of the parties.

The learned judge of the trial court, in addition to permitting the jury to consider the agreement as constituting evidence of an actual partnership, in the first part of instruction No. 1, told the jury as a matter of law that the agreement of February, 1900, was author-

ity to Thomas to hold Hobbs out to the world as a partner. If that be correct and Thomas did so hold him out, then that ends this case unless Thomas was not acting within the usual course of the business, which will be considered later in this discussion. The general rule of law is stated as follows: "The law is well settled that persons who are not actually partners may never-theless become subject to the liabilities of partners either by holding themselves out as such to the public and the world generally, or to particular individuals, or by knowingly or negligently permitting another person to do so." 20 R. C. L. 312; *Owensboro Wagon Company* v. *Bliss, supra; Thayer* v. *Humphrey*, 91 Wis. 216, 54 N. W. 1007, 51 Am. St. Rep. 887, 30 L. R. A. 549; notes 115 Am. St. Rep. 442, 18 L. R. A. (N. S.) 990-1105; *Thompson* v. *Toledo First National Bank*, 111 U. S. 529, 4 S. Ct. 689, 28 U. S. (L. Ed.) 507; *Sun Ins. Co.* v. *Kountz Line*, 122 U. S. 583, 7 S. Ct. 1278, 30 U. S. (L. Ed.) 1137.

The liability as a partner of a person who holds himself out as a partner, or permits others to do so, is predicated on the doctrine of estoppel, and on the policy of the law seeking to prevent frauds on those who lend their money on the apparent credit of those who are held out as partners. 20 R. C. L. section 312; *Morgan* v. *Farrel*, 58 Conn. 413, 20 Atl. 614, 18 Am. St. Rep. 282, notes 22 Am. St. Rep. 757, 115 Am. St. Rep. 442, 18 L. R. A. (N. S.) 988.

In the case of *Anfenson* v. *Banks, supra* (a case very similar to the one at bar, except the claimed holding out was by circular and general notoriety), there is a review of the authorities on the doctrine of equitable estoppel, as applied to partnerships by holding out, and the law is stated in substance to be: The burden of liability as a partner can be imposed on one not actually a partner

only when, by reason of some act or wrong or fault on his part, he has estopped himself to deny the partnership relation. The Supreme Court of the United States, speaking by Field, J., of the doctrine of equitable estoppel, says: "For the application of that doctrine there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury." *Brant* v. *Va. Coal & I. Co.*, 93 U. S. 335, 23 U. S. (L. Ed.) 929. But before the party can set up the estoppel by conduct, he must show that he exercised good faith and due diligence to know the truth. *Morgan* v. *Farrel*, 58 Conn. 413, 20 A. 614, 18 Am. St. Rep. 282.

There was no act done by Hobbs which could in any sense be termed an equitable estoppel, but when that agreement was produced the court and counsel must have concluded that by the statement that a partnership was thereby formed, the use of the term partnership constituted a mutual agency between the parties thereto. This is not true as a legal proposition, for partnership is only a name for a contract which must constitute a co-ownership in business for profit before any partnership rights and liabilities attach to either party. But if in ignorance of law parties make a contract which is void as a partnership, and subsequently hold themselves out in a public manner, then the doctrine of equitable estoppel would apply. Thus it will be seen that two things are necessary in order for a void partnership agreement to make one not an actual partner liable, to-wit, he must thereby consent that his apparent copartner may represent him as a partner in a public manner and he must be held out in a public manner. It is obvious then how

essential it is to the plaintiff's case that there should be some holding out in a public manner. The only evidence of such holding out in the instant case is general reputation, general understanding and opinions of persons in business in Petersburg; all of these constitute only general reputation, and was all the evidence to show that Hobbs had been held out to the public as a partner of Thomas.

The cases from which the doctrine of equitable estoppel has been deduced are those where it was done by means of firm advertisements, bill heads, and signs, and from these circumstances the jury may infer knowledge and assent to the same. 20 R. C. L. section 314; *Fletcher* v. *Pullen,* 70 Md. 205, 16 Atl. 887, 14 Am. St. Rep. 355.

A very few of the early decisions had held that general reputation or understanding in the community may be given in evidence as authority for such holding out, but the vast majority of the cases now hold that general reputation, understanding or gossip are inadmissible to show a holding out or authority to hold out. That is all of the evidence offered in this case of any holding out of Hobbs to the public as a partner. This proposition of law has never been directly passed upon in Virginia, but the uniform partnership act adopts the general line of authority on this subject, and the legislature, in adopting that act, has made the rule laid down by the courts in the great majority of the States and United States Supreme Court the law in this State.

Section 16, uniform partnership act, Acts 1918, page 541, sets forth the essential conditions that constitute an ostensible partnership or partnership by equitable estoppel. The burden is upon the plaintiff to prove (a) that the person sought to be charged

as an ostensible partner *consented* that another might represent him to a particular person as a partner, (b) or consented that he might be represented by another in a *public manner* as his partner, (c) but the plaintiff must also prove *that he gave the credit on the faith of such representation*, except where the representation may be made in a public manner. This very much narrows the rule of equitable estoppel, and eliminates gross negligence, defaults, and ostensible partnership by inferences and speculation upon intent. *Consent in law is an intelligent concurrence or agreement to an act or contract (here to a representation).* It does not include therein inadvertences, misconceptions of the law of partnership, or void efforts to create an actual silent or dormant partnership, and have that by construction created into a consent to be represented publicly as a partner, nor does it include instances where another, who is given authority to represent him as a partner to the trade, *deliberately or innocently exceeds that authority.* Estoppel being constructive fraud there must be such knowledge and consent as clearly implies moral wrong and turpitude in creating the appearance.

It is not necessary that a partnership should have a name. If there is no firm name agreed upon in articles of partnership, then the parties by separate agreement must agree upon a firm name. One party has no right to use another's name as a partner without his consent. A partner by agreement prior to the statute might become a silent or dormant partner. 30 Cyc. 420, 20 R. C. L. 5. It must be noted that there was no agreement for the firm name of J. W. Thomas & Company contained in the agreement of February, 1900, and that during the entire twenty-two years that it is claimed this agreement has been in

effect Hobbs was never published as a partner. A person may become a dormant partner for the purpose of restraining the active partner from securing more credit than the vested capital of the partnership will justify, or gain large credit upon the personal estate of the dormant partner. Consent that a party may represent another who has not agreed upon a firm name, or consented to the use of his name in a certain firm, is a contradiction in terms. There can be no such thing as an ostensible dormant partner. It is clear from the conduct of the parties that it was understood that Hobbs was to be a dormant partner, or Thomas and Hobbs found out after the agreement had been executed that it was void, and therefore was abandoned by Thomas for fifteen years until he wanted to borrow large sums of money. The paper does not on its face consent that Hobbs may be represented as a member of J. W. Thomas & Company.

But it is also claimed that after laying dormant for many years this agreement was all the time vital and binding because of the provision, *"which said co-partnership is to continue from date hereof, for and during the pleasure of the said parties, to be terminated at any time by either of them."* Is not this a contradiction in terms? If the agreement was in law a nullity as a partnership, and never came into existence as the legal entity known as a partnership how can it continue during pleasure when it never existed?

While in an actual partnership a partner may not limit his liability fixed by law, or the authority of the other partner, yet in case of an ostensible partnership the ostensible partner may consent to be represented as such to an individual, or to the particular trade, and the owner of the business cannot exceed his authority. If the agreement be construed as still in

existence the recital "the said copartnership is formed for the sole accommodation of the said J. W. Thomas for the purpose of giving him credit in and about the said trade" could by no process of construction authorize Thomas to represent Hobbs as a partner to the world or in a public manner, nor warrant Thomas in executing negotiable notes for large sums of money upon the credit of Hobbs. The risk and liability of a person who lends his credit to another for the purpose of buying china and crockery for sale is very much less than giving power to execute negotiable paper and sell or discount the same. This case illustrates the difference of risk in a most striking manner. It does not appear that Thomas ever found it necessary to get credit with the trade on the fact that Hobbs was his partner. But it is not sufficient that Thomas has held Hobbs out as a partner, but the bank must have given credit upon the faith thereof.

It is the almost universal rule of law now, that before the plaintiff can bind the ostensible partner, because he consented to another representing him as a partner, *it must be proven that the plaintiff extended the credit* on the faith of such representation. *Thompson* v. *Toledo First National Bank, supra,* 30 Cyc. page 394 and note 93 where cases are cited from United States Supreme Court, England and nearly every State in the Union in support of the rule of law. Where the party to be charged has consented to the representation being made in a *public manner* and such representation has been so made, to-wit, by advertisement, etc., and if the person giving the credit had general knowledge of such public holding out, by the terms of the uniform partnership act it is presumed that he gave credit by reason of the same. Thomas never represented Hobbs as a partner in a *public manner*, there-

fore the bank could have no general knowledge of a thing that never happened, hence there was no evidence in the case upon which the jury could find a verdict.

The plaintiff evidently realized that there was no evidence that Hobbs had consented that Thomas might represent him as a partner in a public manner in the firm of J. W. Thomas & Company, or that he had ever done so, or that the bank had any general knowledge of such representation, therefore, it added to instruction number one the following *fact upon which the credit was based*, and the proposition of law that gave it the right to recover, to-wit: "Or that the said J. W. Thomas, before securing the loans from the said plaintiff, represented to the said plaintiff that the said E. S. Hobbs was his partner in the business of J. W. Thomas & Company and the said plaintiff loaned the said J. W. Thomas & Company the money represented by the notes sued on in this case on the faith *that such partnership existed*, then the said E. S. Hobbs will be liable as a partner as to such transaction." Wright admitted that he gave the credit on the faith of Thomas' statement that Hobbs was an actual partner, and never claimed that the credit was given on any representation of Hobbs as an ostensible partner. The facts were not in dispute, and the plaintiff's sole right to recover is placed in its instructions upon *the existence of an actual partnership between* them under style of J. W. Thomas & Company. This was a question of law for the court and not fact for the jury. The uniform partnership act, section 6, fixes by definition in Virginia when a partnership exists: "A partnership is an association of two or more persons to carry on as co-owners a business for profit," and section 7 provides: "Except as provided by section sixteen persons who are not partners as to each other

are not partners as to third persons." No partnership *ever existed* in law between Hobbs and Thomas because they were never associated as co-owners in business for profit, and the court should have given a peremptory instruction to that effect.

But if it was not intended that the statement of Thomas to Wright constituted Hobbs an ostensible partner in J. W. Thomas & Company, there was no authority contained in the agreement of February, 1900, to warrant that position. Under the law a person may consent to be represented to an individual or particular trade and not to banks, and Hobbs distinctly states that the partnership was formed for the sole accommodation of Thomas to give him credit in and about the trade of buying and selling chinaware, crockery and kindred articles, and that he has never consented that Thomas might represent him to banks with power to execute notes for any sum of money that said banks would lend Thomas on his financial worth, and thereby squander a large part of his estate.

The law of partnership by equitable estoppel is well settled now. It is a legal duty of the lender of money to a concern where the person sought to be charged is not apparently a partner to make investigation, and he is affected with notice of all that inquiry would reveal. However, if the person sought to be charged has consented to be represented as a partner in a public manner, then such public holding out relieves the lender from the duty of inquiry, and the ostensible partner having created an appearance which is false, is estopped to prove the truth.

Applying the law to the instant case, when Thomas came to the plaintiff and sought loans from it upon his statement that Hobbs was his partner (the latter not appearing to be such), it was the duty of the plaintiff to

make inquiry into the authority for that statement, and if he had done so, the agreement of February, 1900, would have plainly disclosed that Thomas had no authority to borrow money upon the credit of Hobbs as a partner.

But suppose Hobbs was an actual or ostensible partner in J. W. Thomas & Company, still is he liable upon the notes in suit?

As a general proposition, a copartner has the right to give a promissory note in the name of the firm, if given in good faith, for partnership purposes, or to one who gives for it a valuable consideration, without notice that it is given for a purpose not within the scope of the partnership.   The uniform partnership act, section 9 (2) provides: "An act of a partner which is not apparently for the carrying on of the business in the usual way does not bind the partnership unless authorized by the other partners."   So that if Hobbs was a partner either actual or ostensible, Thomas had the right to bind him by making notes only in the usual course of business as a part of the usual routine of their affairs.   When Thomas came to Wright to borrow for the business of J. W. Thomas & Company the large sum of twelve thousand dollars, afterwards increased to nineteen thousand three hundred dollars, it was his duty to investigate the affairs or course of the business of the firm.   He knew, apparently, that the concern was not worthy of credit, as he says he loaned the money upon the worth of Hobbs, or investigation would have disclosed that the total invested capital of the firm amounted to about $4,500.00, with debts for merchandise of $500.00, and whether Thomas was going to use the money to pay off notes due the National Bank of Petersburg to which at that time, as disclosed by the records before us, the firm of J. W. Thomas & Company was indebted in the

sum of $21,500.00 evidenced by the notes of the concern, the amount of the loan and the invested capital, together with the fact that Hobbs was only a silent or dormant partner, made it apparent that such large amount of borrowed money was not being used to carry on the ordinary business of concern. By reason of the above facts and circumstances, Wright should have demanded production of the articles of agreement, or communicated with Hobbs whom he met frequently at the meetings of the board of another financial institution, before he loaned Thomas, upon the notes of J. W. Thomas & Company, such sums of money, so entirely out of proportion to the line of credit the firm was entitled, upon the financial worth of a dormant partner, and with no evidence of authority except the mere verbal statement of the borrower. The bank when it made the loan apparently never expected it to be paid from the assets of Thomas & Company, but out of the estate of Hobbs. The notes having been executed beyond the apparent scope of the very small business, there can be no liability upon Hobbs to pay them.

From the foregoing discussion of the law and evidence, the instructions should not have been given as there was no evidence from which an actual partnership or an authority to hold Hobbs out publicly as a partner in J. W. Thomas & Company, and, therefore, as section 6388, Virginia Code, *is mandatory,* this court should enter judgment for the defendant, Hobbs.